STATE of Wisconsin, Plaintiff-Appellant,

v.

Ramon Lopez ARIAS, Defendant-Respondent.

Supreme Court

*No. 2006AP974–CR. Oral argument November 1, 2007.*
*—Decided July 9, 2008.*

2008 WI 84

(Also reported in 752 N.W.2d 748.)

For the plaintiff-appellant the cause was argued by *David H. Perlman,* assistant attorney general, with whom on the briefs was *J.B. Van Hollen,* attorney general.

For the defendant-respondent there was a brief and oral argument by *Lora B. Cerone,* assistant state public defender.

¶ 1. PATIENCE DRAKE ROGGENSACK, J. This case comes before us by certification from the court of appeals. Ramon Arias (Arias) was charged with one count of carrying a concealed weapon, contrary to Wis. Stat. §§ 941.23 and 939.51(3)(a) (2005–06);[1] one count of possession of a switchblade knife, contrary to Wis. Stat. §§ 941.24 and 939.51(3)(a); and one count of possession with intent to deliver no more than five grams of cocaine within 1,000 feet of a school zone, contrary to Wis. Stat. §§ 961.41(1m)(cm)1r, 939.50(3)(f) and 961.49(2)(f).

¶ 2. After a preliminary hearing, the circuit court granted Arias's motion to suppress the weapon and the drugs obtained pursuant to the search conducted following a police dog's sniff of the exterior of the vehicle in which Arias was a passenger. The State appealed the order suppressing the evidence, and the court of appeals certified two issues to this court: (1) "whether, under the Wisconsin Constitution, a dog sniff of a stopped vehicle is a 'search' "; and (2) "whether the vehicle stop was unreasonably prolonged in duration by the officer's controlled substance investigation."[2] In its certification, the court of appeals explained:

---

[1] All further references to the Wisconsin Statutes are to the 2005–06 version, unless otherwise noted.

[2] The parties' briefs raise a third issue: Whether the police dog was sufficiently reliable that his perceived alert to the vehicle provided probable cause that the vehicle contained drugs. However, both Arias and the State agree in the briefs they submitted to us that this issue was not raised before the circuit court, although the dissent attempts to shift the reader's

Here, the period of time to consider is the time consumed by the officer asking drug questions and preparing to release the dog, and then by the dog sniff itself. As we set forth above, the videotape shows that this period was approximately one minute and eighteen seconds.

¶ 3. We answer both certified questions in the negative. First, we conclude that a dog sniff of the exterior of a vehicle located in a public place does not constitute a search under the Wisconsin Constitution.

---

focus to this very issue in order to support its disagreement with the holding of the majority opinion. While we are vested with the authority to consider issues not raised before the circuit court, *County of Columbia v. Bylewski,* 94 Wis. 2d 153, 171–72, 288 N.W.2d 129 (1980), we decline to do so here. The issue of whether the police dog was sufficiently reliable to establish probable cause has factual underpinnings that make it inappropriate for this court to resolve during this appeal. *See, e.g., Wurtz v. Fleischman,* 97 Wis. 2d 100, 107 n.3, 293 N.W.2d 155 (1980) (observing that the power to make factual determinations is reserved to the circuit courts and should be exercised by this court only under "appropriate procedures in the exercise of its constitutional grant of original jurisdiction"). At the circuit court, Rennie's testimony that D'Jango alerted to drugs within Schillinger's vehicle came in as uncontroverted evidence. Arias did not challenge the reliability of the dog's alert. The dissent chooses to omit this part of the case's history.

Instead, the dissent devotes a large part of its opinion to a long lament that the majority opinion does not address whether the drug-sniffing dog actually "alerted" to the presence of drugs in Megan Schillinger's vehicle and if it did, whether the dog's alerts were reliable. Dissent, ¶¶ 63–66. We do not address those issues because Arias never presented them to the circuit court and also because this matter is before us on certification of two issues: (1) "whether, under the Wisconsin Constitution, a dog sniff of a stopped vehicle is a 'search'"; and (2) "whether the vehicle stop was unreasonably prolonged in duration by the officer's controlled substance investigation."

Second, we conclude that Colby-Abbotsford Police Department Officer Brian Rennie (Rennie), who performed a "controlled substance investigation," did not unreasonably prolong his seizure of Arias. In so concluding, we determine that the circuit court's finding that the dog sniff prolonged the detention by "approximately 38 minutes" is clearly erroneous. The great weight and clear preponderance of the evidence shows that the dog sniff prolonged the detention by no more than 78 seconds. Under the totality of the circumstances herein presented, the 78 seconds during which the dog sniff occurred is a not an unreasonable incremental intrusion upon Arias's liberty. Accordingly, the dog sniff did not unreasonably prolong in duration the controlled substance investigation, which comported with the Fourth Amendment of the United States Constitution and with Article I, Section 11 of the Wisconsin Constitution. Therefore, we reverse the order of the circuit court and remand for further proceedings.

## I. BACKGROUND

¶ 4. On August 20, 2005, Rennie, accompanied by his police dog, D'Jango, sat in his police cruiser located in the parking lot of a flower shop, running radar detection on Highway 13. While there, he observed Arias exit a grocery store with three 12–packs of beer and place them in a vehicle he knew belonged to Megan Schillinger (Schillinger). From his acquaintance with Schillinger, Rennie knew her to be 17 years of age. When Schillinger began driving the vehicle containing both the beer and Arias, Rennie stopped them because he believed that Wisconsin law prohibited minors from operating vehicles that contain intoxicants.[3]

---

[3] Wisconsin Stat. § 346.93 prohibits a minor from driving a vehicle that contains intoxicants.

¶ 5. Rennie pulled Schillinger over and called for back-up at approximately 10:45 p.m. He approached the car; explained to Schillinger why he had stopped her; and then he took her driver's license back to his squad car. Though Rennie testified at the preliminary hearing that at this point he radioed dispatch to relay Schillinger's driver's license information, the State does not challenge the circuit court's finding to the contrary: the circuit court found that Rennie did not radio in Schillinger's information until 11:27 p.m. Rennie then returned to Schillinger's vehicle, where he administered a preliminary breath test to her to determine whether she had consumed alcohol. The breath test registered "zero." Rennie then asked Schillinger if there were any drugs in the car. Schillinger replied "no." Rennie then asked Schillinger if she and Arias were "carrying around anything with [them]." She again replied "no." At this point, Rennie returned to his squad car and released D'Jango to perform a sniff around the exterior of Schillinger's vehicle. The State concedes that Rennie did not have a reasonable suspicion of drug activity prior to the dog sniff.

¶ 6. The surveillance video taken from Rennie's squad car captures the activity of D'Jango, who alerts by sitting, which is called a "pass holder." D'Jango appears on the video accompanied by Rennie. D'Jango proceeds to the passenger side of the car, where he sits and barks. D'Jango then gets up and jogs to the driver's side of the car, where he also sits and barks. The time that elapsed from Rennie's question about drugs to the completion of D'Jango's sniff was one minute and 18 seconds. D'Jango's sniff concluded four minutes and ten seconds after Rennie stopped Schillinger's vehicle.

¶ 7. As a result of what he perceived as D'Jango's positive alert on the vehicle, Rennie instructed Arias to

366

exit the vehicle and performed a "pat-down" search of him. After searching Arias, Rennie instructed Schillinger to exit the vehicle, and he performed a "pat-down" search of her. He then proceeded to search Schillinger's car.

¶ 8. Inside the car, Rennie found a plastic bag containing a powdery substance that Arias identified as "coke" stuck between the front seats. Rennie also found a switchblade knife that "popped out" when he placed his weight on the front seat. Both items belonged to Arias.

¶ 9. Officer Jason Bauer, who arrived on the scene in response to Rennie's call for back-up, handcuffed Arias and searched him again, for the officers' safety. Rennie placed Arias in his squad car, removed the beer from Schillinger's car and told her that she was free to leave. The detainment concluded at approximately 11:27 p.m.

¶ 10. Rennie did not issue Schillinger a citation for transporting intoxicants as a minor until the next day. Rennie stated that he had drug evidence in his squad car that he wanted to deliver to the police station and that the encounter had led him to conclude that he "had a bigger concern with [Arias]" than in immediately issuing a ticket to Schillinger.

## II. DISCUSSION

### A. Standard of Review

¶ 11. "Whether police conduct constitutes a 'search' within the meaning of the [Wisconsin Constitution] is a question of law" subject to our independent review. *State v. Miller*, 2002 WI App 150, ¶ 5, 256

Wis. 2d 80, 647 N.W.2d 348. "The question [of] whether police conduct violated the constitutional guarantee against unreasonable searches and seizures is a question of constitutional fact" that we also review independently. *State v. Griffith*, 2000 WI 72, ¶ 23, 236 Wis. 2d 48, 613 N.W.2d 72.

¶ 12. Upon review of an order granting a motion to suppress evidence, we uphold the circuit court's findings of historic fact unless they are clearly erroneous. *State v. Fonte*, 2005 WI 77, ¶ 11, 281 Wis. 2d 654, 698 N.W.2d 594. A finding is clearly erroneous if "it is against the great weight and clear preponderance of the evidence." *State v. Sykes*, 2005 WI 48, ¶ 21 n.7, 279 Wis. 2d 742, 695 N.W.2d 277 (quoting *State v. Tomlinson*, 2002 WI 91, ¶ 36, 254 Wis. 2d 502, 648 N.W.2d 367).

B. Search

¶ 13. Arias asks us to conclude that the dog sniff of the exterior of Schillinger's vehicle was a search within the meaning of Article I, Section 11 of the Wisconsin Constitution and that the officer lacked reasonable suspicion to conduct such a search. Article I, Section 11 is the state analogue to the Fourth Amendment and protects persons against unreasonable searches and seizures.[4]

---

[4] Article I, Section 11 of the Wisconsin Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

¶ 14. The United States Supreme Court has determined that a dog sniff of the exterior of a vehicle is not a search within the meaning of the Fourth Amendment. *Illinois v. Caballes,* 543 U.S. 405, 410 (2005); *see also United States v. Place,* 462 U.S. 696, 707 (1983). The Supreme Court first announced that a dog sniff is not a search in *Place. Id.* There, the defendant aroused the suspicion of law enforcement officers at Miami International Airport, who relayed their suspicion to law enforcement officers in New York, the defendant's destination. *Place,* 462 U.S. at 698. Agents of the Drug Enforcement Agency seized the defendant's luggage after he arrived at LaGuardia Airport and detained it for 90 minutes so that a narcotics detection dog could survey it. *Id.* at 698–99. The dog sniffed the defendant's luggage and signaled that one of his bags contained drugs. *Id.* at 699. The officers then secured a search warrant and found cocaine inside the bag to which the dog had alerted. *Id.*

¶ 15. Although the Supreme Court ruled that the 90–minute interlude between the detention of the luggage and the dog sniff was an unreasonably long seizure warranting suppression of the cocaine, the Court also concluded that the dog sniff did not constitute a search. *Id.* at 707. The Court reasoned that a dog sniff "discloses only the presence or absence of narcotics" and, accordingly, provides distinct limits on lawful private interests that can be revealed through a sniff. *Id.*

¶ 16. *Place*'s conclusion that a dog sniff is not a search within the meaning of the Fourth Amendment was reinforced by *Caballes.* In *Caballes,* the defendant was stopped for speeding and, while the detaining officer issued a ticket for that offense, another officer who arrived at the scene separately permitted his dog to canvass the exterior of the defendant's car. *Caballes,*

543 U.S. at 406. The dog alerted to the trunk, and the officers found marijuana inside. *Id.* The Supreme Court concluded that, because the driver was lawfully seized for a traffic violation, and because a dog sniff of the exterior of a vehicle did not constitute a search, the intrusion of the dog sniff did not "rise to the level of a constitutionally cognizable infringement." *Id.* at 409.

¶ 17. Wisconsin courts have also addressed the question of whether a dog sniff constitutes a search. The court of appeals, in *Miller,* phrased the question presented as whether the "use of a drug-sniffing dog to detect the presence of marijuana inside Miller's car violated her rights under the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution." *Miller,* 256 Wis. 2d 80, ¶ 5.

¶ 18. In *Miller,* the use of a dog sniff of the exterior of a vehicle followed the execution of a search warrant for a residence where police officers had found marijuana. *Id.,* ¶ 2. Subsequent to the search of the residence, the officers checked the cars located nearby on the street, with the assistance of a narcotics detecting dog. *Id.,* ¶ 3. The dog alerted three times to a particular car, and the officers found marijuana in the car. *Id.* In upholding the circuit court's denial of the defendant's motion to suppress, the court of appeals concluded that dog sniffs are not searches under the Fourth Amendment. *Id.,* ¶¶ 4, 9. However, the court did not separately analyze the issue under Article I, Section 11 of the Wisconsin Constitution, and its actual holding addresses only the Fourth Amendment. *Id.,* ¶ 10. Therefore, whether a dog sniff is a search under Article I, Section 11 remained an open question.

¶ 19. Generally, we have interpreted provisions of the Wisconsin Constitution consistent with the United

States Supreme Court's interpretation of their counterparts in the federal constitution. *State v. Jennings,* 2002 WI 44, ¶ 39, 252 Wis. 2d 228, 647 N.W.2d 142. However, on occasion, we have interpreted a provision in the Wisconsin Constitution more broadly than the United States Supreme Court has interpreted a parallel provision in the United States Constitution. *State v. Knapp,* 2005 WI 127, ¶ 56, 285 Wis. 2d 86, 700 N.W.2d 899 (interpreting Article I, § 8 more broadly than the United States Supreme Court has interpreted the Fifth Amendment); *State v. Dubose,* 2005 WI 126, ¶ 45, 285 Wis. 2d 143, 699 N.W.2d 582 (also interpreting Article I, § 8 of the Wisconsin Constitution more broadly than the Fifth Amendment).

¶ 20. Historically, we have interpreted Article I, Section 11 of the Wisconsin Constitution in accord with the Supreme Court's interpretation of the Fourth Amendment. *See, e.g., State v. Malone,* 2004 WI 108, ¶ 15, 274 Wis. 2d 540, 683 N.W.2d 1; *State v. Guzman,* 166 Wis. 2d 577, 586–87, 480 N.W.2d 446 (1992); *State v. Williams,* 47 Wis. 2d 242, 249, 177 N.W.2d 611 (1970). Our coordination of Article I, § 11 with the Supreme Court's Fourth Amendment jurisprudence began long before we were required to follow the Supreme Court's Fourth Amendment jurisprudence by its decision in *Mapp v. Ohio,* 367 U.S. 643 (1961). For example, in *Hoyer v. State,* 180 Wis. 407, 193 N.W. 89 (1923), we excluded evidence that was obtained in violation of Hoyer's constitutional rights under Article I, § 11 of the Wisconsin Constitution, an interpretation consistent with the United States Supreme Court's use of the exclusionary rule under the Fourth Amendment. *Hoyer,* 180 Wis. at 412 (citing *Amos v. United States,* 255 U.S. 313 (1921)). *State v. Eason,* 2001 WI 98, 245 Wis. 2d 206, 629 N.W.2d 625, represents the only time we have

departed from the Supreme Court's construction of the Fourth Amendment in our interpretation of Article I, Section 11.[5]

¶ 21. There are sound policy reasons for this consistency in our jurisprudence. By following the Supreme Court's Fourth Amendment jurisprudence in interpreting Article I, Section 11, we impart certainty about what the law requires for those who will apply our decisions with respect to searches and seizures, and we provide distinct parameters to those who must enforce the law while maintaining the constitutionally protected rights of the people. Therefore, were we to conclude that a dog sniff of the exterior of a vehicle in a public place constitutes a search under Article I, Section 11, we would be undertaking a significant departure from the Supreme Court's Fourth Amendment jurisprudence in interpreting the right to be free of unreasonable searches under the Wisconsin Constitution.

---

[5] In *State v. Eason*, 2001 WI 98, 245 Wis. 2d 206, 629 N.W.2d 625, we examined whether the evidence presented to the magistrate was sufficient to issue a no-knock search warrant. *Id.*, ¶ 1. After we concluded that the evidence was not sufficient, we addressed whether a good faith exception should be applied to the officers' conduct in executing the warrant. *Id.*, ¶ 3. In concluding that a good faith exception could be shown if the State proved the officers reasonably relied upon the warrant, we held that "[t]he burden is upon the State to also show that the process used in obtaining the search warrant included a significant investigation and a review by either a police officer trained and knowledgeable in the requirements of probable cause and reasonable suspicion, or a knowledgeable government attorney." *Id.* While we explained that such a process was followed, although not overtly stated in *United States v. Leon*, 468 U.S. 897 (1984), we specifically required it to satisfy Article I, Section 11 of the Wisconsin Constitution. *Eason,* 245 Wis. 2d 206, ¶ 63.

██

¶ 22. We are unwilling to undertake such a departure here. First, we note that there is no constitutionally protected interest in possessing contraband under the United States Constitution, *United States v. Jacobsen,* 466 U.S. 109, 123 (1984), nor is there a constitutionally protected interest in possessing contraband under the Wisconsin Constitution. Moreover, the occupant of a vehicle has no reasonable expectation of privacy in the air space surrounding a vehicle that he is occupying in a public place. *State v. Garcia,* 195 Wis. 2d 68, 74–75, 535 N.W.2d 124 (Ct. App. 1995).

¶ 23. Second, a dog sniff is much less intrusive than activities that have been held to be searches. *Place,* 462 U.S. at 707. When a dog sniffs around the perimeter of a vehicle, the occupant of the vehicle is not subjected to the embarrassing disclosure or inconvenience that a search often entails. *Id.* The dog sniff reveals only the presence or absence of narcotics, a contraband item. *Id.* Indeed, a dog sniff is unique as a means of detection because, as the Supreme Court has observed, a dog sniff gives limited information that is relevant only to contraband for which there is no constitutional protection. *Id.*

¶ 24. Arias asserts constitutional protection for a place, the area surrounding the outside of Schillinger's vehicle. However, the proscription against unreasonable searches contained within Article I, Section 11 of the Wisconsin Constitution is meant to protect people, not things or places, aside from their relationships to people affected by government action. *See Katz v. United States,* 389 U.S. 347, 351 (1967); *Garcia,* 195 Wis. 2d at 74. The protection afforded to people in relation to things and places is the expectation that

people will be free from government intrusion into places or things in which a person has a reasonable expectation of privacy. *See Katz,* 389 U.S. at 351–52; *State v. Bruski,* 2007 WI 25, ¶¶ 23–24, 299 Wis. 2d 177, 727 N.W.2d 503. As the court of appeals has explained, the occupant of an auto parked in a public place cannot contend that he has a reasonable expectation of privacy in the air space around the exterior of the vehicle. *Garcia,* 195 Wis. 2d at 74. Accordingly, because of the limited intrusion resulting from a dog sniff for narcotics and the personal interests that Article I, Section 11 were meant to protect, we conclude that a dog sniff around the outside perimeter of a vehicle located in a public place is not a search under the Wisconsin Constitution.[6]

## C. Seizure

██

¶ 25. The next question we must address is whether conducting the dog sniff unreasonably prolonged Arias's seizure. As we explained above, the federal and state constitutions protect persons against unreasonable searches and seizures. U.S. Const. amend.

---

[6] Arias also contends that a dog sniff is a search under the Wisconsin Constitution because dogs are "animate creatures prone to weakness and error." He then argues that their fallibility causes dog sniffs to be searches, and therefore, they cannot be employed without reasonable suspicion. We reject this argument for at least two reasons: First, the reliability of a dog sniff does not bear on whether it is a search, but on whether it should be employed by law enforcement in crime detection under any circumstance. Second, if a dog sniff were held to be a search and the officer could employ it if he had reasonable suspicion of drug activity, that reasonable suspicion would not cause the dog sniff to become more reliable.

IV.; Wis. Const. art. I, § 11. Although our legal lexicon often presents "searches and seizures" as an inseparable tandem, the two are constitutionally and analytically distinct. We have set out the parameters of a "search" under the federal and state constitutions as they relate to a dog sniff. A seizure differs from a search, as it "deprives the individual of dominion over his or her person or property." *Horton v. California*, 496 U.S. 128, 133 (1990).

### 1. Duration of the dog sniff

¶ 26. Before discussing the general legal principles that may be applied, or the parties' positions in regard to whether the detention satisfies the constitutional standard of reasonableness, we must first resolve one predicate issue: By how much time did the dog sniff extend the traffic stop? Arias contends that the circuit court's conclusion that D'Jango's sniff prolonged the stop by "approximately 38 minutes" is not clearly erroneous; and therefore, the dog sniff unreasonably prolonged his seizure. In contrast, the State argues that the circuit court's finding with regard to the extension of the stop is clearly erroneous. The State maintains that it was not the dog sniff that extended the stop, but rather the "probable cause of drug activity," which the dog sniff generated, that extended the stop. Accordingly, the State contends that the actual time spent on the dog sniff is 78 seconds, because that is the time that elapsed between Rennie's question to Schillinger about whether the car contained drugs and the conclusion of D'Jango's sniff. The State supports its contention that the 78 seconds is the proper focus by emphasizing that the court of appeals, in certifying the case, identified 78 seconds as the time for us to consider.

¶ 27. The circuit court's finding that the dog sniff prolonged Schillinger and Arias's detention by "approximately 38 minutes" is clearly erroneous. Thirty-eight minutes was the approximate amount of time that elapsed from the conclusion of D'Jango's sniff to Arias's arrest. We conclude that it is against the great weight and clear preponderance of the evidence to find, as it appears the circuit court did, that the 38–minute interval is attributable to the time it took to complete the dog sniff. The 38 minutes that Schillinger and Arias were detained following the dog sniff was occupied by Rennie's search of the vehicle, his pat-down searches of Arias and Schillinger and the activities flowing from the vehicle search. It was those activities, not the dog sniff, that extended the detention by "approximately 38 minutes."

¶ 28. For example, when Rennie saw that D'Jango had alerted to Schillinger's vehicle, he concluded that he had probable cause to search the vehicle and its occupants.[7] Rennie first instructed Arias to exit the vehicle, and then he conducted a "pat-down" search of Arias. He applied the same process with Schillinger. He then searched the vehicle, finding cocaine and a switchblade knife inside. The discovery of contraband precipitated Arias's arrest. It is these activities, not the dog sniff, that occupied the latter 38 minutes of the detainment.[8] Accordingly, it was clearly erroneous for the

---

[7] We do not determine here whether Rennie's assessment that D'Jango's alert provided probable cause was accurate.

[8] The dissent devotes considerable energy to protesting our conclusion that the dog sniff did not prolong the detention by 38 minutes. However, the parties agree that the dog sniff itself occupied only 78 seconds. Once Rennie determined that D'Jango alerted to Schillinger's car, he engaged in the activities

circuit court to find that the dog sniff prolonged the detention by 38 minutes. Therefore, we consider the 78–second extension of Arias's detention in deciding whether Rennie's "controlled substance investigation" was reasonable under all the circumstances. *Terry,* 392 U.S. at 19; *Griffith,* 236 Wis. 2d 48, ¶ 38.

2. General principles

¶ 29. As explained above, this constitutional challenge arises in the course of a traffic stop. Because a traffic stop deprives a detained individual of dominion over his or her person and vehicle, a traffic stop is a seizure. *See Delaware v. Prouse,* 440 U.S. 648, 653 (1979); *Malone,* 274 Wis. 2d 540, ¶ 24. Although it is universally accepted that a traffic stop constitutes a seizure, courts disagree over what level of proof is necessary to support a traffic stop. Some courts, for example, the Supreme Court in *Knowles v. Iowa,* 525 U.S. 113 (1998), and this court in *Malone,* have concluded that a traffic stop is an investigative detention. Investigative detentions, referred to as "*Terry*-stops," are analyzed under a two-part inquiry to determine whether they pass constitutional muster. *Terry v. Ohio,* 392 U.S. 1, 19–20 (1968); *Griffith,* 236 Wis. 2d 48, ¶ 26.

recounted above that related to his investigation of whether drugs were located in the car. The circuit court confirmed that the issue to be addressed was whether the time taken by the dog sniff, itself, was lawful. In framing the issue that the court believed Arias was asking it to address, the court said, "you're concerned, potential points of contention and argument is that that initial stop was extended beyond what would normally be required for that stop to allow a dog sniff slash search to take place. And that is your concern." To which Arias's lawyer responded, "That is correct, Your Honor."

¶ 30. First, courts determine whether the seizure was justified at its inception. *Terry,* 392 U.S. at 19–20. Second, courts determine whether an officer's action "was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20. *Terry* explained that in order for a search to be reasonable, "[t]he scope of the search must 'be strictly tied to and justified by' the circumstances which rendered [the search's] initiation permissible." *Id.* at 19 (citation omitted). The United States Supreme Court in *Terry* reasoned that "[t]he sole justification of the search in the present situation is the protection of the police officer and others nearby, and [the search] must therefore be confined in scope to an intrusion reasonably designed to discover . . . instruments for the assault of the police officer." *Id.* at 29. The term "the scope of" was not defined solely with relation to the purpose for which the stop was made, but rather, also with relation to the public interest of protecting the personal safety of the officer and others, within the parameters of the detainee's Fourth Amendment rights. *Id.*; *see also Maryland v. Wilson,* 519 U.S. 48, 411–12 (1997);[9] *Griffith,* 236 Wis. 2d 48, ¶ 38.

¶ 31. Different constitutional interests are affected by a search,[10] as compared with the interests

---

[9] As the Supreme Court has explained, the "touchstone of our analysis" is the "reasonableness in all the circumstances of the particular governmental invasion." *Maryland v. Wilson,* 519 U.S. 408, 411 (1997). "[R]easonableness 'depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' " *Id.* (citations omitted).

[10] Searches affect privacy interests, such as bodily integrity and those places that a person has reserved for his or her

affected by a seizure.[11] *See, e.g., Griffith,* 236 Wis. 2d 48, ¶¶ 26–27. We note that when "the scope of" a search is reviewed, the focus is on where and how the search was conducted.[12] *See Terry,* 392 U.S. at 19. Where and how the search was conducted are important factors by which to judge the invasiveness of a search because the constitutional right affected by a search is the privacy interests of the person searched. *Katz,* 389 U.S. at 361 (Mr. Justice Harlan, concurring).

¶ 32. By contrast, when a seizure that was lawful at its inception and does not encompass an arrest is reviewed, the scope of the continued investigative detention is examined to determine whether it lasted "no longer than is necessary to effectuate the purpose of the stop," *Florida v. Royer,* 460 U.S. 491, 500 (1983), and whether the investigative means used in the continued seizure are "the least intrusive means reasonably available to verify or dispel the officer's suspicion," *id.*[13] In

individual use. *See Katz v. United States,* 389 U.S. 347, 361 (1967) (Mr. Justice Harlan, concurring).

[11] Seizures affect personal liberty interests such as the freedom of movement and the possession of one's property. *See Delaware v. Prouse,* 440 U.S. 648, 657 (1979).

[12] *Terry* explains: "This Court has held in the past that a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry,* 392 U.S. 1, 17–18 (1968). And further: "The scope of the search must 'be strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Id.* at 19. And further: "[The] sounder course is to . . . make the scope of the particular intrusion, in light of all the exigencies of the case, a central element in the analysis of reasonableness." *Id.* at 18 n.5.

[13] In *Florida v. Royer,* 460 U.S. 491 (1983), two officers stopped Royer in a concourse of the Miami International

that vein, we consider whether the officer diligently pursued his investigation to confirm or dispel his suspicions. *United States v. Sharpe*, 470 U.S. 675, 686 (1985). In *Royer*, the Supreme Court held that the means employed to continue Royer's seizure became unreasonably invasive when Royer, who was stopped in a public area of an airport terminal, was taken to a non-public location such that the "stop" became a "confinement." *Royer*, 460 U.S. at 501.

Airport. *Id.* at 493. They identified themselves and asked to see his identification and ticket. *Id.* at 494. When they noticed that his driver's license bore the name Royer, but his ticket was in the name of Holt, they questioned him about it. *Id.* Apparently unsatisfied with Royer's response and without returning his ticket or identification, they asked him to accompany them to a private room adjacent to the concourse. *Id.* Then, without Royer's consent, the officers retrieved Royer's luggage from the airline and brought it to the room where they had taken him. *Id.* They asked if they could search it. *Id.* Royer produced a key for one of the bags, but said he did not know the combination for the lock on the other bag. *Id.* Both bags were searched and drugs were found. *Id.* at 494–95. This entire process took approximately 15 minutes. *Id.* at 495.

The Supreme Court concluded that from the moment Royer was taken to a private room while the officers retained his identification and ticket the means of his seizure became unreasonably intrusive. *Id.* at 501. The Court concluded that the investigative detention became a confinement equivalent to an arrest. *Id.* However, at that point there was not probable cause to arrest him. *Id.* at 503. The "least intrusive means" to satisfy the officers' suspicions were not employed; and therefore, Royer's Fourth Amendment rights were violated. *Id.* at 504. One of the less restrictive means suggested by the Court that could have been employed to confirm or put aside the officers' reasonable suspicion that Royer was transporting drugs was the use of a drug sniffing dog. *Id.* at 505–06. The Court's decision is driven by the means used to continue Royer's seizure.

380

¶ 33. *Griffith* presented a different type of challenge to the constitutionality of a seizure. Our inquiry there focused on "the incremental intrusion" that was occasioned by an officer's questioning Griffith to determine whether that intrusion was unreasonable. *Griffith*, 236 Wis. 2d 48, ¶ 4. Our concern was whether the duration of the investigative stop was unconstitutionally extended when the officer asked Griffith, a passenger in the stopped vehicle, to step outside of the vehicle and answer questions concerning who he was and where he was going. *Id.* We were not concerned with *the means* used to continue Griffith's seizure, as the Supreme Court was in *Royer.*

¶ 34. In evaluating the challenge Griffith presented, we employed a three-part[14] test that focused on the reasonableness of the continued seizure:

> Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.

*Id.*, ¶ 37 (citation omitted).[15] We reviewed the totality of the circumstances to determine whether the "questioning transformed the reasonable seizure into an

[14] There are occasions when the first two parts of this test are collapsed into one. *See Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977).

[15] We note that this inquiry is somewhat different than that employed in *State v. Malone*, 2004 WI 108, 274 Wis. 2d 540, 683 N.W.2d 1. In *Malone*, we were addressing the limiting certified question of whether an officer may request passengers to exit a vehicle and answer questions that were related to the reason for the traffic stop. *Id.*, ¶ 1. In *State v. Griffith*, 2000 WI 72, 236 Wis. 2d 48, 613 N.W.2d 7, our discussion was not limited by a certified question. See *id.*, ¶ 4.

381

unreasonable one." *Id.*, ¶ 41.[16] We did so because the United States Supreme Court and this court have repeatedly eschewed bright-line rules for identifying whether a seizure is reasonable; instead, courts have focused on the totality of the circumstances that relate to each seizure. *Ohio v. Robinette,* 519 U.S. 33, 39 (1996); *Griffith,* 236 Wis. 2d 48, ¶ 41. There remains no hard-and-fast time limit for when a detention has become too long and therefore becomes unreasonable. *Sharpe,* 470 U.S. at 685–86; *Griffith,* 236 Wis. 2d 48, ¶ 54.

### 3. The parties' positions

¶ 35. The parties do not dispute that the traffic stop falls under *Knowles* and *Terry.* We note that a "routine traffic stop . . . is a relatively brief encounter and 'is more analogous to a so-called "*Terry*-stop" than to a formal arrest.' "[17] *Knowles,* 525 U.S. at 117. With

---

[16] We noted that Griffith was not compelled to answer the officer's questions. *Id.*, ¶ 48. Further, the driver did not have a valid license so we concluded that there was a public interest in determining whether the car could be driven by another occupant or had to be towed. *Id.*, ¶ 47. And in addition, we concluded that there was a public interest in obtaining the identification of witnesses to police-citizen encounters. *Id.*, ¶ 48. The entire encounter from the initial stop to Griffith's answering the questions asked took only a few minutes. *Id.*, ¶ 51. In addition, law enforcement was diligently pursuing the suspected traffic violation that had led to the initial seizure. See *id.*, ¶ 55. Therefore, we concluded that, on balance, the incremental intrusion upon Griffith's liberty occasioned by the questioning was not unreasonable. *Id.*, ¶ 63.

[17] We have previously cited the *Knowles v. Iowa,* 525 U.S. 113 (1998), view of traffic stops and assumed that it applied. *See, e.g., Malone,* 274 Wis. 2d 540, ¶ 24.

respect to the first part of the *Terry* inquiry, Arias concedes that the initial interference with his liberty was justified. He acknowledges that Rennie acted with lawful authority when he stopped Schillinger's vehicle.

¶ 36. However, Arias contends that Rennie impermissibly extended the seizure by allowing D'Jango to sniff the vehicle because the "dog sniff occur[red] outside the scope of the initial traffic stop." Arias's brief, at 25. Therefore, he asserts that the time taken by the dog sniff transformed a reasonable and lawful seizure into an unreasonable and unlawful seizure. Stated otherwise, he contends that the dog sniff expanded the reason for the initial stop, when the expansion was not supported by reasonable suspicion of drug activity. He relies on *State v. Betow,* 226 Wis. 2d 90, 593 N.W.2d 499 (Ct. App. 1999) and *State v. Gammons,* 2001 WI App 36, 241 Wis. 2d 296, 625 N.W.2d 623.

¶ 37. The State asserts that *State v. Gaulrapp,* 207 Wis. 2d 600, 558 N.W.2d 696 (Ct. App. 1996) should control our decision. It contends that *Gaulrapp*'s explanation that it is the duration of time by which the traffic stop was extended that is controlling, not the subject matter of the question that is asked, which we should apply here by analogy to the dog sniff.

4. Reasonableness of the dog sniff

¶ 38. Succinctly stated, the question we must decide is whether the 78 second intrusion upon Arias's liberty that was caused by the dog sniff was reasonable. "Reasonableness . . . depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' " *Pennsylvania v. Mimms,* 434 U.S. 106, 109 (1977)

(citation omitted). A seizure becomes unreasonable when the incremental liberty intrusion resulting from the investigation supersedes the public interest served by the investigation. *Id.* In sum, an unconstitutional continuation of a once lawful seizure can occur when the extension of time for that needed to satisfy the original concern that caused the stop becomes unreasonable or when the means used to continue the seizure becomes unreasonable, both of which are evaluated under the totality of the circumstances presented.

¶ 39. Under the totality of the circumstances before us, we examine the public interest, the degree to which the continued seizure advances the public interest and the severity of the interference of Arias's liberty interest. *Griffith,* 236 Wis. 2d 48, ¶ 37. The dog sniff occurred so Rennie could ascertain whether there were drugs in Schillinger's vehicle. In that regard, the public interest in "prevent[ing] the flow of narcotics into distribution channels" has long been recognized as significant. *Place,* 462 U.S. at 704. The use of a narcotics sniffing dog furthers this public interest by locating narcotics that may not otherwise be detected.[18] The dog sniff was part of the on-going traffic stop of Schillinger that occurred because she was a minor and was transporting alcohol that Arias had placed in her vehicle. The dog sniff of Schillinger's vehicle took 78 seconds to further the public's interest. This brief 78–second ex-

---

[18] *See United States v. Mendenhall,* 446 U.S. 544, 561–62 (1980) (Powell, J., concurring).

Few problems affecting the health and welfare of our population . . . cause greater concern than the escalating use of controlled substances . . . [a]nd many drugs . . . may be easily concealed. As a result, the obstacles to detection of illegal conduct maybe unmatched in any other area of law enforcement.

tension of Arias's seizure is significantly outweighed by the importance of preventing the flow of illegal drugs.[19]

¶ 40. In addition, Rennie diligently pursued his investigation in a manner that could quickly confirm or dispel his suspicions relative to the stop of Schillinger's vehicle. *Sharpe,* 470 U.S. at 686. He observed beer being loaded into a car that was driven by Schillinger, whom he knew was under age. He quickly sought to ensure that Schillinger was not intoxicated, first by administering a preliminary breath test to her and then by inquiring whether drugs were in the vehicle. He released D'Jango to sniff the outside perimeter of the car. All these tasks took only 4 minutes, 10 seconds to accomplish. Rennie's actions were systematic and efficient. Arias was not taken to a non-public location as the defendant was in *Royer.* He remained seated in the passenger compartment of Schillinger's vehicle. Therefore, the incremental intrusion on Arias's liberty is time-focused, as it was in *Griffith.* On balance, we conclude that the incremental intrusion upon Arias's liberty interest that resulted from the 78–second dog sniff is outweighed by the public's interest served thereby. Accordingly, Arias was not subjected to an unreasonable seizure.

¶ 41. Our conclusion is consistent with the discussion in *Gaulrapp.* In *Gaulrapp,* the court of appeals was faced with the contention that asking a question about drugs and firearms, without a reasonable suspicion that Gaulrapp possessed either, caused a lawful seizure to become constitutionally infirm. *Gaulrapp,* 207 Wis. 2d

---

[19] Many articles have been written on the havoc that illegal drugs visit on children and adults. *See, e.g.,* Josephine Gittler, *The American Drug War, Maternal Substance Abuse and Child Protection,* 7 J. Gender, Race & Just. 237 (2003).

at 608. In its discussion, the court of appeals correctly noted that no seizure occurs when law enforcement asks a question without a reasonable suspicion justifying the question so long as an answer is not compelled. *Id.* at 609. The court then noted that it was "the extension of a detention past the point reasonably justified by the initial stop, not the nature of the questions asked, that [may] violate[] the Fourth Amendment." *Id. Gaulrapp* is in accord with numerous federal and state courts.[20] Similarly to *Gaulrapp,* here the relevant inquiry is not whether a dog sniff was conducted, or a question was asked, but whether Arias's detention was unreasonably extended. *Id.*; *see also, Florida v. Bostick,* 501 U.S. 429, 437 (1991).

¶ 42. Arias contends that *Caballes* stands for the proposition that a dog sniff conducted without reasonable suspicion of drug possession is per se violative of the federal Constitution unless the dog sniff is conducted simultaneously with activities germane to what precipitated the traffic stop in the first instance. We disagree. We do not read *Caballes* so narrowly. Indeed, *Caballes* observes that a traffic stop may become unlawful if it is "prolonged beyond the time reasonably required to complete" the activities attendant to the stop. *Caballes,* 543 U.S. at 407. As we have stated above, the time taken to complete the traffic stop and the dog sniff were reasonable.

¶ 43. Furthermore, Arias's reliance on *Betow* and *Gammons* is misplaced. In *Betow,* the court of appeals concluded that Betow's continued detention after he

---

[20] *See, e.g., United States v. Mesa,* 62 F.3d 159 (6th Cir. 1995); *United States v. Fernandez,* 18 F.3d 874 (10th Cir. 1994); *Henderson v. State,* 551 S.E.2d 400 (Ga. Ct. App. 2001); *State v. Gutierrez,* 51 P.3d 461 (Idaho Ct. App. 2002); *State v. Hight,* 781 A.2d 11 (N.H. 2001); *State v. Hansen,* 63 P.3d 650 (Utah 2002).

was stopped for speeding was not warranted by the facts available to the detaining officer. *Betow* is distinguishable from the case before us because the incremental intrusion on Betow's liberty interest was unreasonable under the totality of the circumstances presented. This is so because Betow's traffic stop for speeding had been concluded when the officer asked if he could search Betow's vehicle. *Betow,* 226 Wis. 2d at 92. Betow refused the officer's request. *Id.* Betow also asked the officer for permission to leave. *Id.* Notwithstanding Betow's request, the officer refused to permit him to leave. Additionally, instead of honoring Betow's request, the officer had his dog make "several passes around the car." *Id.* at 93. Next, the officer placed the dog inside Betow's car, where the dog located a packet of marijuana. *Id.*

¶ 44. By contrast, the traffic stop of Schillinger was on-going when the dog sniff of the outside of the vehicle occurred; the dog was not placed inside of Schillinger's vehicle; Arias had not asked to leave and been required to remain. Accordingly, the incremental intrusion upon Betow's liberty was significantly greater than that which occurred here.

¶ 45. We note that *Betow* contains broad dicta that might be read so as to cause confusion with the appropriate inquiry for evaluating the constitutionality of a continuing seizure. For example, *Betow asserts:*

> [T]he scope of the officer's inquiry, or the line of questioning, may be broadened beyond the purpose for which the person was stopped only if additional suspicious factors come to the officer's attention—keeping in mind that these factors, like the factors justifying the stop in the first place, must be "particularized" and "objective."

*Id.* at 94. This dicta misstates the manner in which courts are to evaluate the reasonableness of the con-

tinuation of a seizure that was lawful at its inception. *Betow* was clarified by *Gaulrapp's* explanation that, "[n]o seizure occurs when police, without the reasonable suspicion justifying a *Terry* stop, ask questions of an individual . . . so long as the police do not convey that compliance with the request is required." *Gaulrapp,* 207 Wis. 2d at 609. The dicta in *Betow* quoted above is also inconsistent with *Bostick,* which concludes that law enforcement questions do not result in a seizure, so long as answers are not compelled. *Bostick,* 501 U.S. at 437. As we have explained, the appropriate inquiry involves balancing the public interest in the seizure, the degree to which the continued seizure advances the public interest and the severity of the interference with the liberty interest of the person detained. *Griffith,* 236 Wis. 2d 48, ¶ 37.

¶ 46. *Gammons* is also distinguishable from the totality of the circumstances presented here. In reversing the circuit court's refusal to suppress the evidence, the court of appeals in *Gammons* employed, in part, the dicta from *Betow. Gammons,* 241 Wis. 2d 296, ¶ 18. However, in examining the totality of the relevant circumstances we note that the reason for the initial seizure had been satisfied, *id.,* ¶ 2; the driver and the two passengers had provided identification, *id.;* the officer had run computer checks on all three, *id.;* the officer asked to search the vehicle and the driver had refused, *id.,* ¶ 3. Thereafter, the officer threatened the driver with the further detainment so that he could use a drug sniffing dog, *id.,* and the driver then consented to the search of the vehicle, *id.* Accordingly, the incremental intrusion upon Gammons's liberty interest was significantly greater than the intrusion upon Arias's liberty interest.

¶ 47. In sum, we observe that neither the Fourth Amendment nor Article I, Section 11 of the Wisconsin Constitution prohibit all seizures. Only unreasonable seizures are violative of constitutional rights. In examining the reasonableness of Arias's seizure, we balance the public's interest in preventing the distribution of illegal drugs, the furtherance of that interest by the continued seizure of Schillinger's vehicle and the effect on Arias's liberty interest under the Fourth Amendment and Article I, Section 11 of the Wisconsin Constitution. *See Mimms*, 434 U.S. at 109; *Griffith*, 236 Wis. 2d 48, ¶ 37. The incremental extension of time expended in this stop that was occasioned by the dog sniff was a brief 78 seconds. It was only the 78 seconds of the dog sniff that added to Rennie's efficient efforts to confirm or allay his suspicions that led to the initial stop. This incremental liberty intrusion does not outweigh the public interest served by it; therefore, the incremental intrusion occasioned by the dog sniff satisfies our test for reasonableness. *Griffith*, 236 Wis. 2d 48, ¶ 38. Accordingly, the "controlled substance investigation" comported with the strictures of the Fourth Amendment of the United States Constitution and Article I, Section 11 of the Wisconsin Constitution.

## III. CONCLUSION

¶ 48. In conclusion, we answer both questions certified to us by the court of appeals in the negative. First, we conclude, in accordance with federal Fourth Amendment jurisprudence, that a dog sniff of the exterior of a vehicle located in a public place does not constitute a search under the Wisconsin Constitution. Second, we conclude that Rennie's "controlled substance investigation" did not unreasonably prolong his seizure of Arias. In so concluding, we determine that

the circuit court's finding that the dog sniff prolonged the detention by "approximately 38 minutes" is clearly erroneous. The great weight and clear preponderance of the evidence shows that the dog sniff prolonged the detention by 78 seconds. Under the totality of the circumstances herein presented, the seventy-eight seconds is not an unreasonable incremental intrusion upon Arias's liberty. Accordingly, the dog sniff did not unreasonably prolong in duration the controlled substance investigation, which comported with the Fourth Amendment and with Article I, Section 11 of the Wisconsin Constitution.[21]

*By the Court.*—The order of the circuit court is reversed, and the cause is remanded to the circuit court for further proceedings. Following remand, if a party moves the circuit court to determine whether the dog sniff was sufficient to establish probable cause to conduct a search of Schillinger's vehicle, our decision does not preclude the circuit court from holding a hearing on such a motion, if the circuit court chooses to do so.

¶ 49. ANN WALSH BRADLEY, J. (*dissenting*). Our circuit court judges serve on the front line of the court

---

[21] As the reader moves to a review of the dissent, it is important to keep in mind that the dissent is an attempt to shift the reader's focus from the two certified questions we accepted this case to decide, and onto a discussion of issues that were never raised before the circuit court. That is, Arias provided no testimony before the circuit court that D'Jango had not alerted or that he had a history of unreliability in regard to the alerts he made. Rennie's testimony that D'Jango alerted to the presence of drugs, which he believed provided probable cause to search Schillinger's vehicle, was not objected to or controverted. Accordingly, Arias never argued that the dog sniff was not sufficient to support probable cause to search Schillinger's vehicle where the drugs and weapon were found. This history of the case is not apparent in the dissent.

system. Day in and day out they are called upon to make tough decisions. The circuit court judge here made one of those tough decisions.

¶ 50. It is not always politically well-received when you have the goods—the drugs—on the defendant and yet suppress that evidence based on the state and federal constitutions. Judges make those tough calls because of their commitment to the rule of law and adherence to their oath of office. We expect no less of them.

¶ 51. Those same judges have a right to expect of us that when their case is appealed and we review it, that we neither misconstrue their findings of fact nor their rationale. Unfortunately, the majority here does both.

¶ 52. In addition, the majority advances a novel and problematic constitutional analysis. It fails to follow the test announced by the United States Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968), and instead substitutes a new test. Accordingly, I respectfully dissent.

I

¶ 53. There are two time periods relevant in the case. The first is the 78 seconds between the time Officer Rennie completed the breath analysis test with Schillinger and the time D'Jango completed the sniff of the vehicle. The second time period is the 38–minute stretch (which includes the 78 seconds) between the completion of the breath analysis and the time Officer Rennie called in Schillinger's driver's license information to dispatch.

¶ 54. The majority concludes that the 78–second extension of the traffic stop during which the dog sniff occurred "is not an unreasonable incremental intrusion

upon Arias's liberty." Majority op., ¶ 48. In reaching this conclusion, the majority determines that "the circuit court's finding that the dog sniff prolonged the detention by 'approximately 38 minutes' is clearly erroneous." *Id.*

¶ 55. I agree with the majority that the appropriate focus is the 78 seconds. However, I cannot join the majority's conclusion that the circuit court erred in determining that the dog sniff prolonged the detention by 38 minutes. Rather, the circuit court found that the stop was prolonged by 38 minutes but that the length of the canine sniff was only a small part of the 38 minutes. After the completion of the dog sniff, the constitutional analysis must rely upon an assessment of probable cause.

A

¶ 56. A threshold problem with the majority's analysis is that it misconstrues the circuit court's factual findings and its rationale. In its decision on Arias's motion, the circuit court focused on the fact that Officer Rennie did not request Schillinger's driver's license information until well after the dog sniff was conducted. This led the court to determine that the dog sniff had delayed the traffic stop. The court expressly found that the dog sniff accounted for "roughly *one* minute" (not all 38 minutes) of the extension of the seizure.

¶ 57. As a separate finding of fact, the circuit court determined that the stop was prolonged in total for approximately 38 minutes, that is, for the dog sniff and the subsequent questioning, search, and arrest. The court next concluded that there were no objective and articulable facts giving rise to a reasonable suspicion of illegal activity justifying the entire extension:

Were there other objective and articulable facts that would give the officer a reasonable suspicion that either Ms. Schillinger or the defendant had been engaged in illegal activity allowing an extension of the stop? The court concludes no.

¶ 58. In other words, the circuit court did not make a finding that the dog sniff alone extended the traffic stop by 38 minutes. Rather, it made a determination that the traffic stop was extended by 38 minutes without reasonable suspicion, and that part of the extension included the dog sniff.

¶ 59. Thus, the majority has attributed a factual finding to the circuit court that the circuit court did not make. This misconstruction of the circuit court's decision leads to a void in the majority opinion. It has determined that a 78–second extension for a dog sniff is not unreasonable. However, it has not analyzed whether the rest of the 38–minute extension is reasonable.

¶ 60. The closest the majority comes to an explanation is its statement that the remainder of the 38–minute extension is attributable to activities other than the dog sniff. *Id.*, ¶ 27. However, it does not explain why it matters what activities filled the 38 minutes. The ultimate issue in this case is whether the extension of the traffic stop can be justified *regardless* of what activities took place during the extension.

¶ 61. In other words, the majority has misconstrued the circuit court's rationale. The circuit court's reasoning was based on whether a 38–minute extension of a traffic stop without reasonable suspicion was justified. It was not premised on the entire 38 minutes being occupied by the dog sniff.

¶ 62. I cannot endorse the majority's conclusion that the circuit court clearly erred. The circuit court did

not find that the dog sniff alone prolonged the stop by 38 minutes. Moreover, the circuit court's reasoning had to account for the entire 38 minutes by which Rennie extended the stop. The majority's account fails to account for the entire period.

### B

¶ 63. Nonetheless, I agree that the appropriate focus for this court is the 78 seconds of the dog sniff. On one hand, if the dog sniff established probable cause, then the extension of the traffic stop without reasonable suspicion was only 78 seconds. On the other hand, if the dog sniff did not establish probable cause, the circuit court is correct that there was an impermissible 38–minute extension of the traffic stop without "objective and articulable facts that would give the officer a reasonable suspicion that either Ms. Schillinger or the defendant had been engaged in illegal activity allowing an extension of the stop." However, if the dog sniff failed to establish probable cause, then the search of the vehicle was impermissible on *that* basis (in addition to an unreasonable 38–minute extension of the traffic stop).

¶ 64. In Wisconsin, a dog alert can provide probable cause for a search only where "the dog is trained in narcotics detection and has demonstrated a sufficient level of reliability in detecting drugs in the past and the officer with the dog is familiar with how it reacted when it smelled contraband." *State v. Miller*, 2002 WI App 150, ¶ 12, 256 Wis. 2d 80, 647 N.W.2d 348.

¶ 65. The circuit court's decision in this case was based on its determination that the extension of the traffic stop was not based on reasonable suspicion. It never made a determination that the dog sniff estab-

lished probable cause to conduct the search of Arias and the vehicle. Because the court determined there was no reasonable suspicion to extend the seizure, it did not need to determine whether there was probable cause. As noted by the court of appeals in its certification to this court, the circuit court has not made the findings of fact necessary to establish probable cause: "There was no factual finding by the circuit court as to whether the dog actually did indicate the presence of controlled substances."

¶ 66. Arias argues to this court that the dog sniff here did not establish probable cause. He argues that D'Jango is not sufficiently reliable for his alerts to establish probable cause.[1] In addition, Arias argues that the circuit court never made a finding of fact that D'Jango actually alerted on Schillinger's car.[2] Upon remand the circuit court will have an opportunity to address the issue of probable cause.[3] *See* mandate of the court following majority op., ¶ 48.

---

[1] *See State v. Miller,* 2002 WI App 150, ¶ 12, 256 Wis. 2d 80, 647 N.W.2d 348; *Illinois v. Caballes,* 543 U.S. 405, 409 (2005).

[2] Officer Rennie testified that when D'Jango alerts he "sits passively." *See* Majority op., ¶ 6. However, when deployed here, D'Jango sat, barked, jogged from one side of the car to the other, and sat and barked again. It is questionable whether sitting and barking is tantamount to sitting "passively." Even the court of appeals in its certification to this court stated that it was "not apparent from the videotape" that D'Jango sat passively. Having reviewed the squad video, I agree that it is not apparent that D'Jango ever sat passively.

[3] The majority states that it does not address whether the dog alerted or whether there was probable cause because the issues were not presented to the circuit court and because they were not certified questions.

When this court grants direct review upon certification, it acquires jurisdiction "of an appeal," which includes all issues,

## II

¶ 67. The second reason that I cannot join the majority is that its constitutional analysis is problematic. It fails to apply the second part of the two-prong test set forth in *Terry v. Ohio,* 392 U.S. 1 (1968). Accordingly, its approach conflicts with precedent of the United States Supreme Court as well as precedent from this state.

¶ 68. The majority sets forth the correct test for determining whether an extension of a traffic stop is constitutional. First, a court must determine whether the seizure was justified at its inception, and second, it must determine whether the extension of the seizure "was reasonably related in scope to the circumstances which justified the interference in the first place." Majority op., ¶ 30 (quoting *Terry,* 392 U.S. at 19–20. As the majority notes, the parties agree that the initial seizure was justified at its inception. Majority op., ¶ 35. So far, so good.

¶ 69. Inexplicably, however, rather than applying the second part of the test set forth—whether the extension of the seizure "was reasonably related in scope to the circumstances which justified the interference in the first place"—the majority changes the test. It states that "the question we must decide is whether the 78–second intrusion upon Arias's liberty that was caused by the dog sniff was reasonable." Majority op., ¶ 38. What happened to the rest of the test? The

---

not merely the issues certified, unless the court by order limits the issues on certification. Wis. Stat. §§ 808.05(2); (Rule) 809.61; *State v. Schweda,* 2007 WI 100, ¶ 49, 303 Wis. 2d 353, 736 N.W.2d 49 (Abrahamson, C.J., concurring); *State v. Mitchell,* 167 Wis. 2d 672, 677, 482 N.W.2d 364 (1992); *State v. Stoehr,* 134 Wis. 2d 66, 70, 396 N.W.2d 177 (1986). Here, the order did not limit the issues.

majority simply jettisons the second requirement that an extension of a seizure relate to the circumstances that justify the initial seizure.

¶ 70. The circumstances that justified the initial seizure in this case were Officer Rennie's reasonable suspicion that a minor was transporting beer. However, the majority makes no attempt to explain how the extension of the seizure in order to conduct a dog sniff for drugs reasonably relates to those circumstances. Instead, it simply concludes that because the public has a significant interest in curbing narcotics distribution, a brief extension of the seizure is reasonable. *Id.*, ¶ 39.

¶ 71. The failure to apply the test set forth is crucial to the majority's conclusion. The extension of the seizure in this case is wholly unrelated to the circumstances that justified the initial seizure. Extending the traffic stop to deploy a drug-sniffing dog is not related in the slightest to transportation of beer by a minor. Thus, the extension of the seizure is not "reasonably related in scope to the circumstances which justified the interference in the first place," and is therefore unconstitutional.

¶ 72. Supreme Court precedent on this matter is clear. In *Florida v. Royer*, the Court was adamant that "[a]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." 460 U.S. 491, 500 (1983). In addition to being circumscribed in time, the Court stated that the "scope of the detention must be carefully tailored to its underlying justification." *Id.* There is no question that detention here lasted "longer than [was] necessary to effectuate the purpose of the stop," namely investigating whether Schillinger was transporting beer. Similarly, the scope of the detention was not carefully tailored to its underlying justification. Rather,

397

it was expanded to conduct a dog sniff for drugs, which bears no relation to the underlying justification for the stop.

¶ 73. The approach taken by the majority is also contrary to *United States v. Caballes,* 543 U.S. 405 (2005). In that case, while one officer was writing a warning ticket during a traffic stop, another officer walked a drug-sniffing dog around the defendant's vehicle. *Id.* at 406. The Court was explicit that a seizure justified by the interest of issuing a citation can become unlawful when expanded beyond the time reasonably required to issue the citation. *Id.* at 407. Because the dog sniff in *Caballes* occurred as the citation was being issued, there was no expansion. In contrast, the dog sniff here took place separately from the measures necessary to investigate a minor transporting beer.

¶ 74. The majority opinion also conflicts with Wisconsin precedent. In *State v. Betow,* an officer stopped Betow for speeding. 226 Wis. 2d 90, 92, 593 N.W.2d 499 (Ct. App. 1999). The officer checked Betow's license and registration and asked for permission to search the car. Betow refused, but the officer detained him in order to deploy a drug-sniffing dog. *Id.*, 92–93. The court of appeals determined that a valid traffic stop may be extended if "the officer becomes aware of additional suspicious factors which are sufficient to give rise to an articulable suspicion that the person has committed or is committing an offense" other than the one giving rise to the initial stop. *Id.* at 94. Because there were no such factors present in *Betow,* the court of appeals determined that extension of the seizure was unlawful.

¶ 75. Following *Betow* requires a determination that the extension of the seizure in this case was unconstitutional. The State has presented no argument

that Officer Rennie became aware of additional suspicious factors that would give rise to an articulable suspicion that Schillinger or Arias had committed or were committing an offense other than the one that justified the initial seizure. Nonetheless, the stop was extended.

¶ 76. The majority attempts to distinguish *Betow* on the ground that the traffic stop in that case had concluded and Betow refused the officer's request to search the car. Majority op., ¶ 43. The majority does not explain how it is able to divine that the traffic stop in *Betow* had been concluded when the officer extended the seizure. Betow was still detained and there is no indication in *Betow* that the officer had returned his license and registration. Contrary to the majority's assertion, the problem in *Betow* is that the traffic stop for speeding had *not* been concluded.

¶ 77. Moreover, the fact that Betow refused a request fails to explain the majority's view that the extension of the search in that case was impermissible and the search in the present case was permissible. Schillinger and Arias were not given the opportunity to refuse the search. Officer Rennie retained Schillinger's license and registration and simply conducted the search.

¶ 78. In *State v. Gammons,* a police officer performed a traffic stop for a missing rear license plate. 2001 WI App 36, ¶ 2, 241 Wis. 2d 296, 625 N.W.2d 623. After checking the driver's license and registration, the officer asked to search the vehicle, and the driver refused. *Id.*, ¶ 3. When the officer stated that he was going to have a dog sniff the vehicle, the driver acquiesced to a search. *Id.*

¶ 79. The court of appeals determined that the initial stop in *Gammons* was permissible. *Id.*, ¶ 7.

However, it determined that because the officer stated that he was going to deploy his dog, thereby moving the driver to acquiesce to the search, "the stop was transformed into an unlawful detention." *Id.*, ¶ 24. That is, the extension of the scope was not "reasonably related to the circumstances justifying the initial police interference." *Id.*, ¶ 11 (citing *Terry,* 392 U.S. at 19–20).

¶ 80. *Gammons* dictates the outcome in this case. As in *Gammons,* the search here was extended beyond the time necessary to complete the initial stop, and the extension was not at all related to the circumstances justifying the initial interference.

¶ 81. The majority states that *Gammons* is distinguishable from the present case on the ground that the driver acquiesced to a search because "the officer threatened the driver with further detainment so that he could use the drug sniffing dog." Majority op., ¶ 46. Apparently, the majority thinks that the incremental intrusion upon liberty resulting from the *threat* of further detainment is greater than the incremental intrusion on liberty of *actual* further detainment to deploy a drug sniffing dog. That view is untenable.

¶ 82. Although the majority articulates the correct test for determining whether the extension of a traffic stop is constitutional, it fails to apply the test. Its approach conflicts with precedent of both the United States Supreme Court and this state. Applying the correct test, the extension of the seizure here is unconstitutional because the extension was not reasonably related in scope to the circumstances which justified the initial traffic stop.

### III

¶ 83. In sum, I agree with the majority that the appropriate focus here is the 78 seconds of the dog sniff.

However, I disagree with its conclusion that the circuit court clearly erred in "finding that the dog sniff prolonged the detention by 'approximately 38 minutes.'" Majority op., ¶ 48. That conclusion misconstrues the circuit court's findings of fact and rationale. In addition, the majority advances a novel and problematic constitutional analysis. It fails to follow the test announced by the U.S. Supreme Court in *Terry*, 392 U.S. 1 (1968), and instead substitutes a new test. Accordingly, I respectfully dissent.

¶ 84. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice LOUIS B. BUTLER, JR. join this dissent.