STATE of Wisconsin, Plaintiff-Respondent,

v.

James G. BRERETON,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 2010AP1366–CR. Oral argument September 6, 2012.*
*—Decided February 6, 2013.*

2013 WI 17

(Also reported in 826 N.W.2d 369.)

566

For the defendant-appellant-petitioner, there were briefs and oral argument by *Matthew S. Pinix,* Milwaukee.

For the plaintiff-respondent, the cause was argued by *Daniel J. O'Brien,* assistant attorney general, with whom on the briefs was *J.B. Van Hollen,* attorney general.

¶ 1. PATIENCE DRAKE ROGGENSACK, J. This is a review of a published decision of the court of appeals[1] that affirmed the decision of the Circuit Court for Walworth County[2] denying defendant James G. Brereton's motion to suppress evidence obtained through monitoring by a global positioning system (GPS) device installed on Brereton's vehicle. The installation and monitoring of Brereton's vehicle was accomplished pursuant to a warrant, and Brereton does not allege that the use of GPS is per se unreasonable. Rather, Brereton's challenge first alleges that law enforcement officers lacked probable cause to seize his vehicle and move it to another location where a GPS device could be safely installed.[3] Therefore, he contends, the subsequent installation and monitoring of the GPS device constituted a violation of the Fourth Amendment's prohibition of unreasonable seizures. Additionally, Brereton claims that the GPS tracking of his vehicle utilized more advanced technology than was contemplated under the warrant, thereby effecting an unreasonable search through the execution of the warrant. We conclude that neither of Brereton's arguments demonstrates a violation of Fourth Amendment rights, and affirm the decision of the court of appeals.

[1] *State v. Brereton,* 2011 WI App 127, 337 Wis. 2d 145, 804 N.W.2d 243.

[2] The Honorable Michael S. Gibbs presided.

[3] Brereton does not contend that the initial stop was not lawful.

568

¶ 2. First, we conclude that the seizure of Brereton's vehicle was supported by probable cause that the vehicle was, or contained, evidence of a crime, and was therefore permissible under the Fourth Amendment. The seizure was supported by witnesses' reports that a car matching the make, model, and license plate number of that particular vehicle had been seen at the locations of recent burglaries in the area. Additionally, after officers lawfully stopped Brereton and his co-defendant Brian Conaway[4] in the suspect vehicle, they discovered that the vehicle identification number (VIN) did not match the license plate, and that the occupants of the vehicle were notably similar to the two men seen at multiple recent burglaries. Accordingly, the three-hour seizure of Brereton's vehicle, whereby officers were able to install the GPS device, did not constitute an unreasonable seizure under the Fourth Amendment, as applied to automobiles. Moreover, in light of Brereton's Fourth Amendment interest in avoiding government usurpation of his property for the purpose of conducting surveillance on him, the officers' decision to obtain a warrant prior to conducting the GPS search was proper.

¶ 3. We also conclude that the technology used in conducting the GPS search did not exceed the scope of the warrant allowing GPS tracking of Brereton's vehicle. Judge Carlson issued the warrant based on the probable cause set forth through the facts recited in a detective's affidavit. The affidavit and warrant's language contemplated the installation of a GPS device that would track the vehicle's movements. That the device provided officers with real-time updates of those

---

[4] At trial, Brereton joined Conaway's motion seeking suppression of the evidence at issue; however, Conaway is not a party to this appeal.

movements did not alter the kind of information to be obtained under the warrant, or the nature of the intrusion allowed. Therefore, the officers' execution of the warrant was not unreasonable. Accordingly, we affirm the decision of the court of appeals.

## I. BACKGROUND

¶ 4. In late summer and early fall of 2007, law enforcement agencies in Rock and Walworth Counties received multiple reports of burglaries, many of which shared similar characteristics. Witnesses repeatedly reported having seen two men in a blue or teal late 1980s or early 1990s Pontiac Grand Am or Grand Prix near the burglaries. Multiple other witnesses independently reported that a similar vehicle, also occupied by two men described as similar to those seen at the burglaries, had approached witnesses' houses. In each instance, the man who approached the house had asked whether "Billy Massey" lived there. Also, at multiple burglarized locations, law enforcement found that doors to houses or garages had been kicked in, apparently as a method of entry. At one of the burglarized homes, the detectives found fresh tire tread marks, and noted the design and wear pattern for later comparison.[5]

¶ 5. Notably, one of the witnesses reported that the Pontiac bore an Illinois license plate, number 8643511. A check of the Illinois Department of Transportation database showed that that registration was expired, but that the license plate had been issued to

[5] Ultimately, the officer determined that the tire tread marks at the scene of the robbery bore similar design and wear pattern to the vehicle in which Brereton and Conaway were stopped.

Nicholas Klabacha, 1510 Willowbrook Drive, Belvidere, Illinois, for a 1996 Pontiac coupe. Walworth County detectives visited that location, but found an unoccupied residence. Additionally, Rock County Sheriff's Department records for that Illinois license plate showed that deputies had recently stopped a Buick bearing that plate, and that Brereton's co-defendant Conaway had been a passenger in that vehicle when it was stopped.

¶ 6. On October 5, 2007, Detective Robert Sharp of the Walworth County Sheriff's Department contacted Detective Richard Kamholtz of the Rock County Sheriff's Department to exchange information regarding the burglaries that had been occurring in the area. Detective Kamholtz advised Detective Sharp of at least two burglaries in Rock County with very similar facts to those in Walworth County, and reported that a Rock County Sheriff's deputy had located a blue Pontiac bearing Illinois license plate number 8643511 outside of a residence in Beloit. Detective Kamholtz stated that he would visit the residence to determine if a GPS device could be installed on the vehicle at that location.

¶ 7. Detective Kamholtz later determined that the area where the car was located was not conducive to installation of a GPS device, and decided to continue to monitor the vehicle visually. At that same time, another Walworth County Sheriff's detective, Robert Schiltz, was in the process of preparing an affidavit for a court order to authorize installation of a GPS device on the vehicle.

¶ 8. The officers decided that they would conduct a stop of the vehicle based on its expired registration, its missing rearview mirror, and its loud exhaust, in an attempt to facilitate installation of a GPS tracking device in the vehicle. In accordance with this plan, a Rock County Sheriff's deputy then stopped the vehicle,

571

a blue 1993 Pontiac Grand Am, along Highway 51 outside of Janesville, where he was joined by two Walworth County detectives.

¶ 9. After stopping the vehicle, the officers obtained identification from the two occupants, Brereton and Conaway. At that time, the officers learned that neither man had a valid driver's license. During the stop, the detectives also discovered that the vehicle's VIN did not match the VIN associated with the Illinois license plate. Instead, the VIN of the men's vehicle showed that that vehicle was registered to a woman who resided in Clinton, Wisconsin.

¶ 10. After the officers determined that neither Brereton nor Conaway had a valid driver's license, and therefore neither could legally operate the vehicle, the officers took them to a nearby Dollar Store so that the men could make arrangements for someone else to pick up the vehicle. The joint law enforcement team decided that rather than installing a GPS device on the side of Highway 51, which would be potentially unsafe, the vehicle would be towed to a private impound lot where installation of the GPS could be accomplished. Neither Brereton nor Conaway were told that the vehicle was being towed.

¶ 11. Soon after the vehicle was towed to the impound lot, Detective Schiltz obtained a signed court order allowing the installation of a GPS device in the seized vehicle.[6] The order, which was based on Detective Schiltz's affidavit, provided in relevant part:

> The Walworth County Sheriff's Department . . . or other law enforcement agencies acting on its behalf, are

---

[6] As recognized in *State v. Sveum,* 2010 WI 92, ¶¶ 20 & 39, 328 Wis. 2d 369, 787 N.W.2d 317, such an order constitutes a warrant for Fourth Amendment purposes.

authorized to place an electronic tracking device on: a 1993 blue Pontiac Grand Am SE 4 door registered to Sherry Bloyer of Clinton, Wisconsin, vehicle identification # 1G2NE543N7PM605764, and they are hereby authorized to surreptitiously enter and re-enter the vehicle, any buildings and structures containing the vehicle[] or any premises on which the vehicle[] [is] located to install, use, maintain and conduct surveillance and monitoring of the location and movement of the target vehicle in all places within or outside the jurisdiction of Walworth County. This includes, but is not limited to private residences and other locations not open to visual surveillance, to accomplish the installation. Officers are authorized to obtain and use keys to operate and move the vehicle[] for the required time to a concealed location and are authorized to open the engine compartment[] and trunk area[] of the vehicle[] to install the device[].

It is further ordered that Detective Robert Schiltz, or other law enforcement officers, shall remove the electronic tracking device as soon as practicable after the objectives of the surveillance are accomplished or not later than sixty (60) days from the date this order is signed unless extended by this court or another court of competent jurisdiction.

Thereafter, law enforcement officers installed the GPS device inside the hood of Brereton's vehicle,[7] and then returned the vehicle to the location at which Brereton and Conaway had been stopped.

---

[7] We refer to "Brereton's vehicle" for ease of reference, and make no substantive determination of Brereton's actual interest in the tracked vehicle. As discussed below, the State has asserted that Brereton had no valid possessory or privacy interests in the vehicle in which the GPS unit was installed. Our decision in this case, however, is unaffected by the State's argument, and we assume without deciding that Brereton's possessory or privacy interest in the vehicle was sufficient to assert a claim for a violation of his Fourth Amendment rights.

¶ 12. Over the next four days, the GPS device transmitted information about the movements of the vehicle. Walworth County law enforcement officers received text messages to the telephone associated with the GPS device whenever the vehicle started moving and when movement ended. Officers could then track the vehicle's movement in real-time[8] using computer software.

¶ 13. Four days after the GPS device was installed, law enforcement tracked the vehicle to a residential location in the town of Janesville, where the vehicle stopped for approximately ten minutes. Officers were dispatched to check that area for possible burglaries, and discovered a house with the front door kicked in. When officers went inside, it appeared that numerous personal belongings were missing. The owner of the residence confirmed that, in addition to the personal belongings, including a flat screen computer monitor, $1,500 in currency (in $100 denominations) also was missing.

¶ 14. Soon after discovering the break-in, law enforcement officers stopped the GPS-tracked vehicle, which was driven by Brereton with Conaway as a passenger. Both were immediately arrested. Incident to that arrest, officers searched the vehicle, wherein they found a flat screen computer monitor; additionally, Brereton had $1,300 in $100 bills clenched in his hand.

¶ 15. Brereton was charged with 14 criminal counts, including both felonies and misdemeanors. Brereton subsequently moved to suppress evidence obtained through the use of the GPS device, including evidence found in his vehicle on the day he was ar-

---

[8] Real-time transmission relays information at the actual time that the vehicle's movement happens.

rested, on the ground that the evidence was obtained in violation of his Fourth Amendment rights against unreasonable searches and seizures.[9] After briefs, testimony, and oral argument, the Circuit Court for Walworth County denied Brereton's motion. Brereton then pleaded guilty to some counts, and others were dismissed but read in.[10] Brereton was sentenced to 12 years imprisonment, consisting of seven years of incarceration and five years of extended supervision.

¶ 16. After judgment was entered on his plea, Brereton appealed the denial of his suppression motion, in accordance with Wis. Stat. § 971.31(10) (2009–10) (allowing review of a motion to suppress after entry of a guilty plea and judgment thereon). The court of appeals affirmed. We accepted Brereton's petition and now affirm the decision of the court of appeals.

## II. DISCUSSION

### A. Standard of Review

¶ 17. Brereton argues that the installation of the GPS device was accomplished by an illegal seizure of his vehicle, and that the information that law enforcement obtained by using the GPS device unreasonably exceeded the scope of the warrant. Both of the issues

---

[9] Brereton bases his challenge exclusively on the Fourth Amendment to the United States Constitution, without relying on the parallel provision in the Wisconsin Constitution, Article I, Section 11.

[10] When charges are read in, the circuit court agrees to the dismissal of those charges, and the defendant agrees that the circuit court can consider the read in charges when sentencing is done on the counts to which the defendant has pleaded guilty. *See State v. Frey,* 2012 WI 99, ¶ 35, 343 Wis. 2d 358, 817 N.W.2d 436.

raised turn on whether law enforcement officers' conduct violated the Fourth Amendment's protections against unreasonable searches and seizures. These issues present questions of constitutional fact. *See State v. Sveum,* 2010 WI 92, ¶ 16, 328 Wis. 2d 369, 787 N.W.2d 317. We uphold the circuit court's findings of historical fact unless those findings are clearly erroneous; however, the application of Fourth Amendment principles to the facts found presents a question of law that we review independently. *Id.*

### B. Standing

¶ 18. We begin by addressing the State's argument that Brereton does not have Fourth Amendment "standing" to challenge the search or seizure in this case. The State contends that Brereton has not demonstrated any possessory or privacy interests in the vehicle and therefore, he does not have standing to assert that the actions of law enforcement infringed his Fourth Amendment rights. In particular, the State claims that there is no evidence in the record showing that Brereton owned the vehicle, that he had permission to use it, or even that the vehicle was not stolen. *Cf. State v. Bruski,* 2007 WI 25, ¶ 22, 299 Wis. 2d 177, 727 N.W.2d 503.

¶ 19. We decline to address the State's standing argument. The State raises this issue for the first time before this court and "[t]he general rule is that issues not presented to the circuit court will not be considered for the first time on appeal." *State v. Caban,* 210 Wis. 2d 597, 604, 563 N.W.2d 501 (1997). Although we may choose to consider such issues, countervailing considerations of fairness, efficiency, and institutional competency are generally persuasive when determining

whether an issue raised for the first time on appeal should be addressed. *Id.* at 604–05.

¶ 20. Furthermore, for our discussion of GPS devices and their impacts on Fourth Amendment concerns, the matter of standing need not be addressed. Accordingly, we assume, without deciding, that Brereton has standing to assert Fourth Amendment challenges in this case.

## C. Relevant Fourth Amendment Principles

### 1. Fourth Amendment standards regarding seizures

¶ 21. Brereton contends that the officers' towing his vehicle constituted an unreasonable seizure. This argument asserts that law enforcement seized Brereton's vehicle without a warrant or probable cause. Accordingly, we examine the Fourth Amendment's requirements for seizures of vehicles.

¶ 22. The Fourth Amendment to the United States Constitution provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

██

¶ 23. A seizure deprives an individual of "dominion over his or her person or property," *Horton v. California,* 496 U.S. 128, 133 (1990), whereas a search occurs "when an expectation of privacy that society is

577

prepared to consider reasonable is infringed." *United States v. Jacobsen,* 466 U.S. 109, 113 (1984). The two interests underlying seizures and searches are analytically distinct, and the infringement of one does not always implicate the other. *See State v. Arias,* 2008 WI 84, ¶ 25, 311 Wis. 2d 358, 752 N.W.2d 748. In particular, seizures generally are considered less intrusive than searches, based on the type of rights infringed: "[a] seizure affects only the person's possessory interests; a search affects a person's privacy interests." *Segura v. United States,* 468 U.S. 796, 806 (1984). We first examine the law relevant to seizures involving automobiles, and then turn to the privacy interests implicated by the search of a vehicle, namely, the tracking of a vehicle using GPS technology.

¶ 24. The stop of an automobile by law enforcement constitutes a seizure of the vehicle, as well as its occupants. *See Whren v. United States,* 517 U.S. 806, 809–10 (1996). The towing of the vehicle from the location at which it was stopped continues a seizure of the vehicle. *See State v. Sumner,* 2008 WI 94, ¶ 9, 312 Wis. 2d 292, 752 N.W.2d 783 (noting that a seized vehicle would be towed because the driver's license was suspended). A seizure conducted without a valid warrant is presumptively unreasonable. *See United States v. Ross,* 456 U.S. 798, 824–25 (1982). The requirement that seizures be undertaken pursuant to a valid warrant is subject to certain, limited exceptions. *Id.* at 825. Relevant here is what is referred to as the "automobile exception," which recognizes that law enforcement officers may, in certain circumstances, conduct seizures involving automobiles without first obtaining a warrant. *See Chambers v. Maroney,* 399 U.S. 42, 48–52 (1970).

¶ 25. Initially established in *Carroll v. United States,* 267 U.S. 132 (1925), the automobile exception provides that law enforcement officers may seize a vehicle, its occupants, and personal property inside the vehicle, without a warrant, when officers demonstrate that probable cause exists to justify the intrusion.[11] *See Chambers,* 399 U.S. at 51–52; *Whren,* 517 U.S. at 809–10. We have stated that probable cause requires that law enforcement officers show that there was a "fair probability" that the place or container seized (in this case, a vehicle) contained or was itself evidence of a crime. *See State v. Carroll,* 2010 WI 8, ¶ 28, 322 Wis. 2d 299, 778 N.W.2d 1; *see also Chambers,* 399 U.S. at 49 (" 'The measure of legality of such a seizure is, therefore, that the seizing officer shall have reasonable or probable cause for believing that the automobile which he stops and seizes has contraband . . . therein which is being illegally transported.' ") (quoting *Carroll,* 267 U.S. at 155–56).

¶ 26. *Chambers* is a hallmark case involving the automobile exception. In *Chambers,* officers stopped a vehicle based on witness reports that a similar vehicle with similar occupants had been seen fleeing the scene of a robbery. *Chambers,* 399 U.S. at 44. Within an hour, officers located a vehicle that matched the witnesses' description, and whose occupants also matched the witnesses' particularized reports of suspects present at the robbery. *See id.* After removing the suspects from the vehicle, officers decided that they would move the vehicle from the dark parking lot in which the vehicle

---

[11] The necessary antecedent to the seizure of a vehicle is that, prior to stopping the vehicle, law enforcement officers must have at least reasonable suspicion that criminal activity is afoot. *See State v. Anagnos,* 2012 WI 64, ¶ 47, 341 Wis. 2d 576, 815 N.W.2d 675.

was stopped to the police station, where they could more safely and effectively conduct a search. *See id.* at 52 n.10.

¶ 27. In evaluating whether the officers' decision to move the vehicle was unreasonable under the Fourth Amendment, the Court examined the "automobile exception," and explained that the purpose of the exception was to allow officers to seize vehicles upon probable cause, but without a warrant, because doing so serves the substantial state interest of preventing probable criminals from avoiding capture, as well as preventing the removal of incriminating evidence from law enforcement's jurisdiction. *See id.* at 47–52. The Court concluded that the officers' decision to continue the seizure and move the vehicle was reasonable under the circumstances. *See id.* at 51–52.

■■

¶ 28. Since *Chambers,* the Court has reaffirmed the validity of the automobile exception, as well as its allowance that officers may continue the seizure of a vehicle and move it, based upon probable cause that the vehicle is or contains evidence of a crime, when doing so serves substantial law enforcement interests, and when law enforcement officers have sought to use those methods least likely to infringe upon citizens' Fourth Amendment rights. *See Ross,* 456 U.S. at 808 n.10. Accordingly, when analyzing an individual's Fourth Amendment claim of an unreasonable seizure of an automobile, one of the court's considerations is to balance the public interest in investigating and thwarting crime against the private interests in maintaining dominion over one's possessions; the court must examine the extent to which the seizure serves the public interest and infringes upon private interests. *See Arias,* 311 Wis. 2d 358, ¶ 34; *see also United States v. Place,*

462 U.S. 696, 703 (1983). In the context of warrantless seizures involving automobiles, there exists a strong governmental interest, recognized under the Fourth Amendment, to ferret out crime and conduct necessary investigations before the vehicle and its occupants may be "spirited away." *See Florida v. White,* 526 U.S. 559, 565 (1999).

¶ 29. In addition to law enforcement officers' substantial interest in investigating and preventing crime upon a showing of probable cause, other "substantial" governmental interests may justify warrantless seizures. *See Place,* 462 U.S. at 703–04. Particularly relevant in this case are law enforcement's "substantial" interests in "minimizing the risk of harm" to officers or occupants of a vehicle. *See id.* These interests are significant when the object to be seized is a vehicle located in a public place. *See White,* 526 U.S. at 565–66.

¶ 30. The Fourth Amendment's general allowance of warrantless seizures of vehicles based upon probable cause is intended to strike a balance between the protection of individual rights and the recognition that, when an individual has given law enforcement officers probable cause to believe that a crime is being or has been committed, the individual's Fourth Amendment interests are diminished:

> [I]f an immediate search on the scene could be conducted, but not one at the station if the vehicle is impounded, police often simply would search the vehicle on the street—at no advantage to the occupants, yet possibly at certain cost to the police. The rules as applied in particular cases may appear unsatisfactory. They reflect, however, a reasoned application of the more general rule that if an individual gives the police probable cause to believe a vehicle is transporting

contraband, he loses the right to proceed on his way without official interference.

*Ross,* 456 U.S. at 807 n.9. Therefore, as long as officers have probable cause to believe that the vehicle is, or contains, evidence of a crime, warrantless seizures of automobiles may be lawful, provided that they are conducted reasonably.[12] *See Chambers,* 399 U.S. at 51–52; *Ross,* 456 U.S. at 824–25; *see also Place,* 462 U.S. at 707–10 (recognizing that warrantless seizures must be conducted reasonably).

2. Fourth Amendment standards regarding searches

¶ 31. The Fourth Amendment interests implicated by searches differ from those implicated by seizures. Whereas the allegations that a seizure was unreasonable are analyzed in terms of a balance of the public and private interests at issue, as well as the reasonableness of the means used to effectuate the seizure, the reasonableness of a search looks to how and where a search was conducted. *See Arias,* 311 Wis. 2d 358, ¶¶ 31–32. Focusing on how and where a search was conducted addresses whether the search was unreasonable because the Fourth Amendment prohibits unreasonably intrusive incursions upon privacy interests of individuals. *See id.,* ¶ 31.

---

[12] Notably, in *United States v. Ross,* 456 U.S. 798, 806 n.8 (1982), the Court relied upon the longstanding history of the warrant requirement's exception for movable vehicles, recognizing that "individuals always had been on notice that movable vessels may be stopped and searched on facts giving rise to probable cause that the vehicle contains contraband, without the protection afforded by a magistrate's prior evaluation of those facts."

¶ 32. Accordingly, whether an individual has a reasonable expectation of privacy in avoiding the method of search and a reasonable expectation of privacy in the place searched are the questions that drive a court's examination of the reasonableness of the search. This is so because the protection against unreasonable searches attaches to people, not places or things, "aside from their relationships to people affected by government action." *See id.*, ¶ 24. For example, when the claim alleged is an unreasonable search, interference with places or things is insufficient to sustain the claim unless the individual alleging an unreasonable search demonstrates that he or she had a reasonable expectation of privacy in the place or thing searched. *See id.; see also Katz v. United States,* 389 U.S. 347, 351 (1967).

¶ 33. In *Sveum,* 328 Wis. 2d 369, ¶¶ 39, 52, we upheld the validity of a search warrant authorizing the use of GPS technology to track an individual's vehicle and monitor the occupants' movements and locations. In *Sveum,* we assumed, without deciding, that the use of a GPS device constituted a search. *Id.,* ¶¶ 73–74. However, recently, in *United States v. Jones,* 132 S. Ct. 945 (2012), the Supreme Court confirmed that the use of GPS technology to track an individual's movements in his vehicle is a search for Fourth Amendment purposes. *Id.* at 949–50.

¶ 34. Although the Court's majority opinion in *Jones* discussed the Fourth Amendment violation in terms of the government's trespass upon an individual's property, *see id.* at 949–51, warrantless GPS tracking would constitute a search "even in the absence of a trespass, [because] a Fourth Amendment search occurs when the government violates a subjective expectation

of privacy that society recognizes as reasonable." *Id.* at 954–55 (Sotomayor, J., concurring) (quoting *Kyllo v. United States,* 533 U.S. 27, 33 (2001)) (internal quotation marks omitted).[13] The privacy interest at issue in *Jones,* and in this case, where the government has utilized Brereton's property[14] to apply GPS technology to monitor his movements, is government usurpation of an individual's property "for the purpose of conducting surveillance on him, thereby invading privacy interests long afforded, and undoubtedly entitled to, Fourth Amendment protection." *See id.* at 954 (citing *Silverman v. United States,* 365 U.S. 505, 511–12 (1961)).

### 3. Warrant execution

¶ 35. In contrast to warrantless seizures under the "automobile exception," which are not entitled to a reviewing court's deference, where a neutral and detached magistrate has determined that probable cause exists for the issuance of a warrant, courts will accord great deference to the magistrate's determination. *See Sveum,* 328 Wis. 2d 369, ¶ 25. Where a valid warrant exists, the reasonableness of the method by which a search or seizure was conducted nevertheless will be examined. *See id.,* ¶ 53. However, the choice of method of execution of a warrant is typically left to the discre-

---

[13] It is important to note that the majority opinion in *United States v. Jones,* 132 S. Ct. 945 (2012), did not overrule *Katz v. United States,* 389 U.S. 347 (1967), and the cases that follow *Katz*'s reasoning, but rather, relied on another Fourth Amendment concern.

[14] Because we assumed, without deciding, that Brereton had standing to raise Fourth Amendment claims, we must assume that Brereton had at least the right to possess the vehicle in question.

tion of law enforcement officers, provided that the chosen method is "reasonable." *See id.*

## D. Application

¶ 36. Brereton's first argument for suppressing the GPS evidence against him is that the extension of the seizure of his vehicle to tow it was illegal as not having been supported by probable cause, and that, alternatively, the method of effectuating the seizure was unreasonable because officers did not wait for the warrant before towing his vehicle. We disagree.

¶ 37. By the time that Brereton and Conaway were stopped by Rock and Walworth County officers, officers from both counties' sheriff's departments had conducted substantial investigations and surveillance in connection with the burglaries in which the vehicle was implicated. The two departments had investigated approximately 35 burglaries that shared similar characteristics. Therefore, Walworth County Sheriff's officers possessed information that (1) the vehicle in which the men were riding was very similar to the vehicle that had been seen at multiple burglaries; (2) the vehicle also was similar to the vehicle described as having been used by two men similar to the burglars, who had suspiciously approached homes in the area of the burglaries; (3) the license plate of the vehicle corresponded to at least one witness's account of a suspicious vehicle in the area near one of the burglaries; and (4) the vehicle had a loud exhaust, no rearview mirror, and expired license plates whose legitimacy was already suspect due to reports that the plate had recently been found on a Buick in Rock County. Accordingly, the

585

officers had at least a "fair probability" that the vehicle was or contained evidence of a crime. *See Carroll,* 322 Wis. 2d 299, ¶ 28.

¶ 38. Then, when the officers approached the vehicle and began to interact with Brereton and Conaway, they discovered that the men did not have valid driver's licenses and that the vehicle's VIN did not correspond to the license plate. It should be noted that neither of these facts (no licenses, incongruous VIN) was necessary to show that the officers had probable cause to seize Brereton's vehicle. The information that the officers obtained after stopping the vehicle simply lent further support to the conclusion that probable cause existed for the continuing seizure of the vehicle.

¶ 39. Brereton argues, however, that the warrant that was issued impermissibly relied upon the information that officers learned after the stop, namely the VIN and the physical similarities that Brereton and Conaway shared with witnesses' reports of the men seen at the locations of the burglaries. Brereton argues that reliance on that information is impermissible because those additional pieces of information were obtained as a result of the illegal seizure of the vehicle. Brereton is mistaken on at least two grounds.

¶ 40. First, as discussed above, the officers had probable cause to continue the stop and tow the vehicle, based on the plethora of information suggesting that the vehicle Brereton was driving was connected to numerous burglaries in the area. Second, the officers were justified in noting the vehicle's VIN, as well as the physical characteristics of the vehicle's two occupants. Law enforcement officers are not prohibited from continuing their investigatory efforts after a lawful stop, when they have probable cause to believe the vehicle is,

or contains, evidence of a crime. *Cf. Carroll,* 322 Wis. 2d 299, ¶¶ 22–25 (recognizing officer's valid possession of defendant's cell phone, after defendant exited vehicle following high-speed chase and officer ordered defendant to drop what was in his hands; analogizing cell phone to evidence collected during pat-down search incident to investigatory stop).

¶ 41. Moreover, the probable cause that the officers had at the time of the stop of Brereton's vehicle was sufficient to justify the officers' decision to continue the seizure of the vehicle and move it to a location where a GPS device could be installed more safely and effectively. *See Ross,* 456 U.S. at 807 n.9 (reaffirming that where officers have probable cause to justify the warrantless seizure of an automobile, they may conduct an immediate search of the vehicle, and if an immediate, warrantless search on the street is justified, moving the vehicle for a search at another location is equally permissible).

¶ 42. Indeed, the Supreme Court's decisions in *Ross, Chambers,* and *White* provide explicit support for the methods chosen by the officers in this case. After seizing Brereton's vehicle pursuant to probable cause that the vehicle was or contained evidence of the rash of local burglaries, the officers elected to move the vehicle from its location along Highway 51 to the impound lot, where officers awaited judicial authorization prior to installing the GPS device. *Cf. Chambers,* 399 U.S. at 51–52. After receiving such authorization, officers installed the GPS device. Accordingly, under the relevant Supreme Court precedent, with probable cause for the seizure, neither the fact that officers moved the vehicle to install the GPS, nor the amount of time that officers held the vehicle can be said to be unreasonable in light

of law enforcement's substantial interests in safety and in the effective installation of the GPS device that was used to search the vehicle.

¶ 43. Notwithstanding our acceptance of the officers' decision to continue the seizure of Brereton's vehicle and to move it, we also recognize that the decision to install a GPS device on Brereton's car required officers to obtain a warrant because the use of a GPS device constituted a search that extended beyond the scope of the automobile exception for warrantless searches. *Jones,* 132 S. Ct. at 949–50. The installation of the GPS device was distinguishable from the typical search under the automobile exception because law enforcement's target was not evidence *within* the car, which under the exception gives rise to a need to quickly collect evidence within the car before the evidence can be removed from the jurisdiction. *See White,* 526 U.S. at 565.

¶ 44. Here, although officers did have an interest in the attachment of the GPS device before the car escaped the jurisdiction, the nature of the evidence that they sought and the privacy interest implicated by the GPS search required judicial authorization, which the officers dutifully obtained. By receiving judicial authorization, the officers adhered to the Fourth Amendment's protection of Brereton's interest against unwarranted government usurpation of his property for the purpose of conducting surveillance on him. *See Jones,* 132 S. Ct. at 954 (Sotomayor, J., concurring). The judicial approval, based on an affidavit setting forth probable cause for the search, is entitled to deference, *see Sveum,* 328 Wis. 2d 369, ¶ 25, and Brereton has demonstrated no basis for us to disturb the judge's decision to issue the warrant.

¶ 45. We turn, then, to Brereton's second asserted basis for suppressing the evidence, i.e., that the method of executing the warrant exceeded the scope of the search the warrant authorized. Brereton's argument reduces to a claim that, because neither the affidavit in support of the warrant for installing the GPS device, nor the warrant itself, contemplated the use of a GPS device that would allow officers to track Brereton in real-time, the execution of the warrant was unreasonable.

¶ 46. Our analysis of this claim begins and ends with the language used in the affidavit in support of the warrant and in the warrant itself. In the relevant portion of his affidavit seeking permission to install a GPS device, Walworth County Detective Robert Schiltz stated that:

> [T]he GPS tracking device, which is covertly placed on a criminal suspect's automobile, is equipped with a satellite radio receiver, which, when programmed, periodically records at specified times, the latitude, longitude, date and time of readings and stores these readings until they are downloaded to a computer interface unit and overlaid on a computerized mapping program for analysis.

The warrant that Judge Carlson issued incorporated the premises of Detective Schiltz's affidavit, and simply added the manner in which law enforcement officers could install and maintain a GPS device.

¶ 47. Brereton makes much of what he reads in the affidavit as limitations on how a GPS device would be utilized, and asserts that the language mandates that the system would be limited to storing locational information on that device, and that officers would be able to learn of Brereton's movements only after re-

trieving the GPS device from Brereton's vehicle and manually downloading the information to a computer for analysis. However, neither the language of the affidavit, nor the practical realities of constantly evolving electronic tracking technology require such a cabined reading of the language setting forth the permissible scope of GPS tracking under the warrant.

¶ 48. Brereton's argument hinges largely on the use of the terms "periodically," "store," and "download" in the affidavit. His position seems to be based upon the similarity between the warrant at issue in this case and the affidavit and warrant in *Sveum*, 328 Wis. 2d 369, ¶¶ 6–9. In *Sveum*, the warrant authorized the installation and continued use of a GPS device that required law enforcement officers to occasionally retrieve the device from the target vehicle and manually download the stored locational data onto a computer for review. *Id.* Brereton suggests that this similarity between the warrants led Judge Carlson to believe that the warrant he was issuing contemplated *exactly* the same hardware and software as was utilized in *Sveum*, and nothing else.

¶ 49. The language used in the affidavit in this case does not bind law enforcement to a specific GPS technology, and we decline to read such limitations into the warrant based on the type of GPS technology used in *Sveum*. Although we do not attempt to compare and contrast the technological intricacies of GPS devices and their corresponding software, here, the challenged language in the affidavit and warrant can reasonably be read to allow the use of the GPS device that officers chose, notwithstanding its advanced technology that permitted transmission of information in real-time.

¶ 50. For example, although "periodically" might be read to mean "every fifteen minutes," without any

other suggestion in the affidavit to that effect, the term could just as easily mean "every millisecond." The same relativity is apparent in the term "store": storage could refer to long-term storage on the device, or it might refer to the instantaneous and temporary storage of the information on the device prior to its transmission to another storage location, whether in cloud storage or on a designated hard drive. The same can be said for "download," which can occur automatically and immediately after collection of the information, or it may require manual effort at a later time.

¶ 51. This is not a case in which the language of the affidavit or warrant required one kind of GPS tracking device. Here, the officers used technology reasonably contemplated under the warrant, whereby the officers were able to increase their efficiency,[15] at no demonstrated, unreasonable cost to the Fourth Amendment interests of Brereton.

¶ 52. Brereton argues, however, that the instantaneous nature of the informational transmission created an intrusion that is different in *kind,* rather than simply a difference in *degree.* His argument makes reference to the requirement that warrants particularly describe the places and things to be searched, and suggests that the warrant in this case described the kind of evidence for which officers could search by reference to the technological capabilities of *Sveum-*esque hardware and software.

¶ 53. We see no basis in the affidavit, the warrant, or existing law for this conclusion. The warrant, by

[15] For example, in *Sveum,* 328 Wis. 2d 369, ¶ 8, over the course of an entire month, officers were required to return to the vehicle twice after the initial installation to recover and replace the GPS unit. Here, the GPS tracking was completed in four days.

incorporating Detective Schiltz's affidavit, provided what law enforcement officers were authorized to seek using the GPS device: "evidence of the . . . criminal violation [discussed in Detective Schiltz's affidavit], as well as the location where the fruits of the crimes are being stored and the identification of associates assisting in the aforementioned crimes." This is the same kind of information that officers obtained under the warrant in *Sveum*.

¶ 54. Instantaneous transmission of the same kind of information as would be available for later download from a *Sveum*-type GPS device does not alter the kind of information transmitted, or make the warrant allowing such search any less particularized as to the places and things that it allowed to be searched. It simply allows law enforcement officers to conduct their investigation efficiently, and in real-time, as opposed to after the fact. The difference here, between Brereton's hoped-for, more antiquated GPS device and that which was actually used, is merely one of degree: a decrease in the amount of time between when the vehicle moves and when officers learn about that movement. We have never equated police efficiency with unconstitutionality, and we decline to do so now.[16]

## III. CONCLUSION

¶ 55. We conclude that the seizure of Brereton's vehicle was supported by probable cause that the vehicle was, or contained, evidence of a crime, and was therefore permissible under the Fourth Amendment. The seizure was supported by witnesses' reports that a car matching the make, model, and license plate num-

---

[16] We suggest that the legislature address the constantly evolving nature of electronic incursions.

ber of that particular vehicle had been seen at the locations of recent burglaries in the area. Additionally, after officers lawfully stopped Brereton and Conaway in the suspect vehicle, they discovered that the VIN did not match the license plate, and that the occupants of the vehicle were notably similar to the two men seen at multiple recent burglaries. Accordingly, the three-hour seizure of Brereton's vehicle, whereby officers were able to install the GPS device, did not constitute an unreasonable seizure under the Fourth Amendment, as applied to automobiles. Moreover, in light of Brereton's Fourth Amendment interest in avoiding government usurpation of his property for the purpose of conducting surveillance on him, the officers' decision to obtain a warrant prior to conducting the GPS search was proper.

¶ 56. We also conclude that the technology used in conducting the GPS search did not exceed the scope of the warrant allowing GPS tracking of Brereton's vehicle. Judge Carlson issued the warrant based on the probable cause set forth through the facts recited in a detective's affidavit. The affidavit and warrant's language contemplated the installation of a GPS device that would track the vehicle's movements. That the device provided officers with real-time updates of those movements did not alter the kind of information to be obtained under the warrant, or the nature of the intrusion allowed. Therefore, the officers' execution of the warrant was not unreasonable. Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 57. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). Search and seizure of automobiles (and their

contents) have a long, and still developing, constitutional history in state and federal courts.[1] This jurisprudence, although mired by plurality and conflicting opinions, has generally been favorable to searches and seizures of automobiles without warrants. Most recently, however, the United States Supreme Court has trended toward restricting law enforcement's ability to conduct warrantless searches of automobiles.[2]

¶ 58. The present case rests on a familiar narrative: Law enforcement officers stop and seize a vehicle on probable cause for a violation of traffic laws. The basis for the stop and seizure is pretextual. The officers' true motive for stopping the vehicle is not to issue a traffic citation, but to search the vehicle, typically for contraband drugs.

## I

¶ 59. Just like in that narrative, the officers in the present case made a "routine pretextual traffic stop." One distinguishing factor in the present case is that the officers freely admit the pretext. Therefore, this court need not guess at their motives.

¶ 60. After coming upon the defendant's vehicle and realizing the license plate matched that of a vehicle seen near a reported burglary, the officers followed the vehicle for nearly two hours. While other officers were in the process of seeking a warrant authorizing a seizure of the vehicle and a search of the vehicle (that is, installation of a GPS device on the vehicle), the officers

---

[1] See generally case law discussed by 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment,* ch. 7 (5th ed. 2012) (Search and Seizure of Vehicles).

[2] *See, e.g., United States v. Jones,* ___ U.S. ___, 132 S. Ct. 945 (2012); *Arizona v. Gant,* 556 U.S. 332 (2009).

following the vehicle found probable cause to stop the vehicle for traffic violations. They then conducted what they readily admitted was a routine pretextual traffic stop.[3] Specifically, the officers admitted that their goal in conducting the traffic stop was not to warn or cite the

[3] The officers testified that at approximately 11:00 a.m. on October 5, 2007, they located the defendant's vehicle parked outside a Beloit residence and decided to attach a GPS device to it. The officers determined that the vehicle's location at the time would not allow them to attach a GPS device undetected, because it was parked on a residential street and several people walking around the neighborhood would see them. The officers decided to keep the vehicle under surveillance and apply for a warrant for the GPS device.

The officers followed the vehicle when it left the residence and traveled to a restaurant in Janesville. The officers then decided that they would stop the vehicle when it left the restaurant because "the license plates on the vehicle [were] expired and the vehicle [had] a loud exhaust." The officers watching the vehicle noticed that "the two male/white occupants in the vehicle fit the description perfectly of the suspicious subjects that had been witnessed by a complainant in our county on the day that several of their daytime residential burglaries started."

At approximately 12:56 p.m., a Rock County Deputy Sheriff conducted a pretextual traffic stop of the vehicle along Highway 51 by the Rock County Airport, near Janesville. The deputy observed the vehicle had expired plates, no rear view mirror and a slightly louder than normal muffler. A Rock County Sheriff's Department detective arrived on the scene and observed the vehicle as a "medium blue" car, which could also reasonably be described as teal or robin's egg blue. The vehicle seemed to fit the description of a car observed near reported burglaries. The two white male occupants, Brereton and Conaway, whose identities were ascertained during the initial traffic stop, also fit the description of the men seen near the burglaries.

When a vehicle is lawfully stopped, an officer ordinarily may ask the driver for his or her name, driver's license and

defendant for a traffic violation, but rather to seize the vehicle so that they could search it by installing a GPS device to monitor the vehicle's future whereabouts and investigate whether the vehicle and its occupants were involved in reported burglaries in the area.[4]

¶ 61. After the valid traffic stop, the officers removed the occupants from the vehicle, transported them to a distant location and clandestinely took control of the vehicle without a warrant, towing it to a private lot, thus interfering with the defendant's possessory and privacy interests in the vehicle for at least

---

registration as a routine matter. *State v. Griffith,* 2000 WI 72, ¶¶ 45–51, 236 Wis. 2d 48, 613 N.W.2d 72.

With regard to the Vehicle Identification Number (VIN), which was obtained at the initial stop and included in the warrant affidavit, the United States Supreme Court has explained: "In sum, because of the important role played by the VIN in the pervasive governmental regulation of the automobile and the efforts by the Federal Government to ensure that the VIN is placed in plain view, we hold that there was no reasonable expectation of privacy in the VIN." *New York v. Class,* 475 U.S. 106, 114 (1986).

[4] The affidavit in support of the warrant explained that the purpose of installing the GPS device was to "lead to evidence of the aforementioned criminal violation, as well as the location where the fruits of the crimes are being stored and the identification of associates assisting in the aforementioned crimes." There is no time stamp recording when the affidavit for the warrant was submitted. It is clear, however, that the affidavit was submitted after the initial traffic stop because the affidavit includes information that the officers learned only after they stopped the vehicle.

At 1:08 p.m., twelve minutes after the stop, one officer informed another officer that he was getting a court order for the installation of a GPS device. At 1:14 p.m., an officer relayed information to another officer and to an assistant district attorney. This information was included in the affidavit.

three hours.[5] Law enforcement seized the vehicle before a warrant was issued.

¶ 62. After obtaining a warrant to seize and search the vehicle, the officers executed the search by opening the vehicle and installing the GPS device.[6] The process of obtaining the warrant and installing the GPS device apparently took about three hours.[7] The officers then returned the vehicle to the place where they originally had stopped it, and the vehicle remained there for another four hours.

¶ 63. The traffic stop was based on probable cause to believe that the defendant had violated traffic laws. The defendant's brief clearly states that the defendant does not object to the initial traffic stop and the "seizure" of the automobile at that time (even though it was a pretextual stop). Such an objection would in all likelihood be unsuccessful. Rather, the defendant chal-

---

[5] The defendant asserts that the seizure began when he was removed from the vehicle and taken to the Dollar Store to arrange for him and the car to be retrieved. The record does not show the defendant objected to leaving the vehicle or asked to remain with the vehicle.

[6] *United States v. Jones,* ___ U.S. ___, 132 S. Ct. 945 (2012), establishes that the installation of a GPS device in a car constitutes a search within the meaning of the Fourth Amendment.

[7] At approximately 3:35 p.m., officers at the private lot were notified that the court order had been signed and that they could go ahead and install the GPS device on the vehicle. Installation was completed at approximately 3:56 p.m.

There is no record of when the vehicle actually was removed from the private lot and returned to Highway 51. It is known that the vehicle did not leave its location on Highway 51 until approximately 7:47 p.m.

Except for the impounding of the vehicle before the warrant was issued, this case demonstrates excellent police work.

lenges the State's subsequent interference with his possessory and privacy interests in his personal property.

¶ 64. The defendant and the State focus on the validity of the conduct of the law enforcement officers after the lawful traffic stop in towing and stowing the vehicle for three hours. Because the seizure under the initial traffic stop lasted for at least three hours (and perhaps longer) and morphed into a burglary investigation, the defendant and the State treat the impounding of the vehicle (towing and stowing the vehicle) as a seizure separate and distinct from the initial traffic stop and seizure.

¶ 65. The continuation of a traffic stop based on probable cause must be reasonably limited in time and scope to fulfill the purposes of the initial stop.[8] A valid traffic stop and seizure can become unlawful if it is prolonged and is not reasonably related in scope to the circumstances that justified the initial interference in the first place.[9] As Professor LaFave puts it, the questions are how long the seizure may last and what is permissible during that interval.[10]

¶ 66. I begin by noting that under the Fourth Amendment, the defendant's vehicle is a constitutionally protected "effect." In the present case, the State engaged in a physical invasion of the defendant's "effect" by towing and stowing the vehicle. In other words, the State encroached on a constitutionally protected area by trespassing on the defendant's property.

---

[8] *Illinois v. Caballes,* 543 U.S. 405, 407–08 (2005); *State v. Malone,* 2004 WI 108, ¶¶ 24, 26, 274 Wis. 2d 540, 683 N.W.2d 1.

[9] *Griffith,* 236 Wis. 2d 48, ¶ 26.

[10] 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment,* § 9.2 at 436, § 9.3 at 472 (5th ed. 2012).

¶ 67. The Fourth Amendment protects the "right of the people to be secure in their . . . effects against unreasonable searches and seizures." Justice Scalia, writing for the majority in *United States v. Jones*, ___ U.S. ___, 132 S. Ct. 945 (2012), discussed the relationship of the Fourth Amendment and trespass as follows: The Fourth Amendment embodies "a particular concern for government trespass upon the area ('persons, houses, papers, and effects') it enumerates."[11]

¶ 68. A seizure of a vehicle without a warrant is presumptively violative of the Fourth Amendment. Majority op., ¶ 24.

¶ 69. I conclude that in the present case, as in *Jones*, the State committed a common law trespass. I further conclude that the trespass (seizure) was not reasonable under the circumstances of the present case.[12] The majority explains that to determine the reasonableness of a seizure, a court must balance the public interest in investigating and thwarting crime against the private interests in maintaining dominion over one's possessions. Majority op., ¶ 28. Unfortunately, the majority does not conduct this balancing test.

¶ 70. In applying the test of objective reasonableness to the seizure and its continuation, I conclude that under the circumstances of the present case, the State's dominion over the defendant's vehicle was prolonged beyond a reasonable time and was not reasonably

---

[11] *Jones*, 132 S. Ct. at 950.

[12] The United States Supreme Court did not reach the issue of the reasonableness of the warrantless installation of the GPS device because the Government did not raise that issue in the court of appeals. *Jones*, 132 S. Ct. at 954.

599

related in scope to the circumstances which, according to the majority opinion, justified the initial and continuing seizure of the vehicle.

¶ 71. To render the seizure reasonable, the majority opinion attempts to place the towing and stowing of the vehicle within the "automobile exception" to the warrant requirement. Courts have been more lenient in permitting warrantless searches or seizures of automobiles than warrantless searches of other premises. The automobile exception has over the years been based on the mobility of cars and diminished expectation of privacy in cars.[13] Under the automobile exception relevant to the instant case, a car may be seized or searched (1) if the car contains evidence of a crime; or (2) if the car is evidence of a crime.

¶ 72. Quoting snippets of United States Supreme Court cases dealing with the automobile exception to the warrant requirement, the majority opinion declares that the officers had probable cause to believe that the vehicle contained evidence of a crime or was evidence of a crime and that therefore the warrantless seizure of the automobile was lawful. Majority op., ¶¶ 2, 30, 42, 55.[14]

¶ 73. The majority opinion repeatedly explains that the continued seizure was valid because the

[13] 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment,* § 7.2 at 721–22 (5th ed. 2012).

[14] Although the automobile exception developed to apply in exigent circumstances, later cases eliminated the exigency requirement. Doubts remain about the necessity of an exigency requirement for purposes of a warrantless seizure of a vehicle on probable cause.

In *Chambers v. Maroney,* 399 U.S. 42, 51 (1970), addressing the automobile exception, the Court stated: "Only in exigent circumstances will the judgment of the police as to probable cause serve as a sufficient authorization for a search."

defendant's vehicle contained evidence of a crime, justifying the warrantless seizure. Nevertheless, at ¶ 43, the majority opinion reveals that "law enforcement's target was not evidence *within* the car, which under the exception gives rise to a need to quickly collect evidence within the car before the evidence can be removed from the jurisdiction." Indeed, the law enforcement officers in the present case made no attempt to examine the interior of the vehicle to collect *evidence of a crime within the vehicle.*

¶ 74. The State's warrantless interference with the defendant's dominion over the vehicle for three hours was not reasonably related in time or scope to the

---

In *Coolidge v. New Hampshire,* 403 U.S. 443, 461–64 (1971), involving a warrantless seizure of a vehicle, the Court declared that the seizure was unconstitutional when no exigent circumstances existed making it impracticable to secure a warrant. In *Coolidge,* as in the instant case, "the police had known for some time of the probable role of the [automobile] in the crime," and police knew the whereabouts of the driver, negating the argument that the car could be moved quickly without the police's knowledge.

In *Maryland v. Dyson,* 527 U.S. 465, 466–67 (1999), the Court explained that exigent circumstances are no longer required to conduct a warrantless *search* of a car as long as the car is readily mobile and probable cause exists to believe the vehicle contains contraband.

The Court has not addressed whether exigent circumstances are required to *seize* a car without a warrant as evidence of a crime when the vehicle is not readily mobile. The vehicle in the present case was not readily mobile when the unlicensed driver was removed from the vehicle and the officers could ensure that the vehicle was not mobile by watching over the vehicle without seizing it. *See* 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment,* § 9.2 at 436, § 9.3 at 360 (5th ed. 2012).

circumstances which, according to the majority opinion, justified the initial and continuing seizure of the vehicle, namely examining the interior of a vehicle for evidence of a crime contained within the vehicle. The officers extended their seizure beyond the time and scope reasonably permitted by the automobile exception for warrantless seizures of a car for evidence within the car.

¶ 75. With regard to the majority's numerous assertions that the *vehicle itself was evidence of a crime,* such that the State could commit a trespass and tow and stow the vehicle for three hours without judicial authorization, the majority states: "[A]lthough officers did have an interest in the attachment of the GPS before the car escaped the jurisdiction, the nature of the evidence that they sought and the privacy interest implicated by the GPS search required judicial authorization . . . ." Majority op., ¶ 44.

¶ 76. This concession that a warrant was required due to the nature of the evidence sought and the privacy interest implicated undercuts the majority's rationale that the State's warrantless seizure was justified because the vehicle was in and of itself evidence of a crime. The State's interference with the defendant's dominion over the vehicle did not reasonably relate in time or scope to the circumstances that, according to the majority opinion, justified the initial and continuing seizure of the vehicle, namely that the vehicle was in and of itself evidence of a crime. The officers extended their seizure of the vehicle beyond the scope permitted by the automobile exception for warrantless seizures of automobiles as evidence of a crime.

¶ 77. According to the case law, the most common justifications for a warrantless seizure of a vehicle as evidence of a crime are that there is probable cause to

believe that a crime occurred in the vehicle;[15] that the vehicle was used as a weapon;[16] or that the vehicle is an instrumentality of a crime such as drug trafficking or gun running.[17]

¶ 78. The vehicle in the present case was not seized for three hours for any of these purposes. There was no probable cause to believe a crime occurred in the vehicle or that the vehicle was used as a weapon. If probable cause existed to believe the vehicle was an instrumentality of a crime (burglary) inasmuch as the vehicle matched eyewitness descriptions of a vehicle

[15] *United States v. Noster,* 590 F.3d 624 (9th Cir. 2009) (vehicle seized after officers determined it had been reported stolen); *Capraro v. Bunt,* 44 F.3d 690 (8th Cir. 1995) (vehicle seized incident to arrest as evidence of a kidnapping that defendant used his vehicle to commit); *State v. Serna,* 290 N.W.2d 446 (Minn. 1980) (vehicle seized so sexual assault victim could identify vehicle in which assault had occurred); *State v. Clark,* 24 P.3d 1006 (Wash. 2001) (vehicle impounded to search for evidence of a rape and murder that occurred in the vehicle).

[16] *Cardwell v. Lewis,* 417 U.S. 583 (1974) (vehicle seized to inspect tires and take paint scrapings to identify vehicle that pushed another vehicle over an embankment); *United States v. Belt,* 854 F.2d 1054 (7th Cir. 1988) (vehicle seized incident to arrest so victim could identify it as vehicle that tried to run him off the road); *Tackett v. State,* 822 S.W.2d 834 (Ark. 1992) (parts of vehicle seized to establish that vehicle had intentionally rear ended another vehicle); *Commonwealth v. A Juvenile (No. 2),* 580 N.E.2d 1014 (Mass. 1991) (vehicle seized to preserve evidence of a hit-and-run accident involving the vehicle); *Edlin v. State,* 523 So. 2d 42 (Miss. 1988) (vehicle seized as evidence of a hit-and-run accident involving the vehicle).

[17] *United States v. Dickey-Bey,* 393 F.3d 449 (4th Cir. 2004) (vehicle seized with probable cause that vehicle was used as an instrumentality of the crime); *United States v. Brookins,* 345 F.3d 231 (4th Cir. 2003) (vehicle seized after arrest when defendant's wife attempted to flee in vehicle and police had probable cause to believe contraband would be found in the vehicle).

seen in the vicinity of reported burglaries, the least intrusive method of identification would have been to photograph the vehicle. Officers could have photographed the vehicle where they initially located it, or at the site where the vehicle was stopped, before releasing it. The photographs could have been shown at trial for witnesses to identify as the vehicle they saw leaving the burglary scene.[18] The officers in this case, after seizing the vehicle and towing and stowing it, did indeed photograph the tires, exterior, and interior of the vehicle (through the windows) while awaiting the warrant.

¶ 79. I conclude that the State's interference with the defendant's dominion over the vehicle by moving and detaining the vehicle for three hours to install a GPS device is not reasonably related in time or scope to the circumstances that, according to the majority opinion, justified the initial and continuing seizure of the vehicle, namely that the vehicle was in and of itself evidence of a crime.

¶ 80. In addition to trying unsuccessfully to squeeze the seizure into the automobile exception, the majority opinion also tries to characterize the seizure of the car as falling within other exceptions to the warrant requirement.

¶ 81. The majority opinion asserts that the seizure was required by exigent circumstances because the officers were trying to minimize the risk of harm to themselves, others, and the vehicle. Majority op., ¶¶ 29, 41, 42. Such a pretext here is patent. After following the vehicle for nearly two hours, the law

---

[18] See Keplin v. Hardware Mut. Cas. Co., 24 Wis. 2d 319, 331, 129 N.W.2d 321 (1964) (photographs of a car are sufficient to be used as evidence at trial so that actual car does not have to be viewed).

enforcement officers chose the place to conduct the traffic stop; they cannot create the exigency.

¶ 82. The facts further belie the majority's assertion. The law enforcement officers testified that they towed the vehicle in order to install a GPS device secretly. The law enforcement officers further testified that they did not follow the department's guidelines for impounding the vehicle.[19] Adherence to department protocol is evidence of reasonableness.[20] The officers then returned the vehicle to the place where it was initially stopped.

¶ 83. The seizure also cannot be justified by an immediate need to seize the vehicle or install a GPS device. The officers could have simply maintained the status quo and waited by the stopped vehicle until the warrant arrived authorizing the seizure and search.[21] The officers did not fear the vehicle would move because the driver had been transported to a distant location, and the officers could ensure that the vehicle did not leave its location by watching over it without seizing it. Instead, officers had the vehicle towed and waited by the vehicle in the lot to which it was towed. Here the officers took affirmative steps, without any exigent circumstances and prior to obtaining a warrant, to tow and stow the vehicle without a warrant that they later did obtain.

---

[19] Both the Rock County and Walworth County Sheriff's Departments have General Orders for Policy and Procedure that seem to require that once a vehicle is seized, the contents are to be inventoried.

[20] *State v. Callaway,* 106 Wis. 2d 503, 518, 317 N.W.2d 428 (1982) (citing *South Dakota v. Opperman,* 428 U.S. 364, 372 (1976).

[21] *See Segura v. United States,* 468 U.S. 796, 801, 812–13 (1984).

¶ 84. All told, this case needs far more careful discussion and analysis by the majority opinion of the State's invasion of the defendant's possessory and privacy interest in the vehicle and the defendant's privacy interest with respect to surveillance of the movements of the vehicle before a reader is persuaded that the State has overcome the presumption that the warrantless seizure of the vehicle is a violation of the Fourth Amendment.[22]

## II

¶ 85. I began with a narrative about oft-heard, old-time twentieth century cases in which officers stop and seize a vehicle on probable cause for violation of traffic laws. I end with the present case, a twenty-first century narrative grounded in GPS technology.

¶ 86. The single main difficulty with the majority opinion is that it fails to appreciate that this case presents the court with the opportunity to begin the process of reconciling ever-changing technology with constitutional principles. The majority opinion fails to grasp, as United States Supreme Court Chief Justice John Roberts has carefully expounded, that the most daunting challenge for courts in the next 50 years will be to determine how to apply the Constitution in cases as science and technology advance.[23]

---

[22] For a good discussion of the issues involved in the automobile exception and the case law, see case law discussed by 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment,* ch. 7, entitled "Search and Seizure of Vehicles" (5th ed. 2012).

[23] Chief Justice John G. Roberts, Jr., Speech at Rice University (Oct. 17, 2012). Full video of the speech is available at https://mediacore.rice.edu/media/centennial-lecture-series-a-conversation-with-the-.

¶ 87. Chief Justice Roberts recently counseled students at Rice University as follows: "When the framers wrote the Fourth Amendment about search and seizures, did they envision wiretaps?" "Is being able to see through walls a violation of search and seizure protections? I think it will be a good opportunity to see how prescient the framers were if the Constitution will be able to deal with these questions." "[S]o we try to find the . . . fundamental principle underlying what constitutional protection is and apply it to new issues and new technology."[24]

¶ 88. The Chief Justice clearly identified the challenge. Our court seems oblivious to it.

¶ 89. Police surveillance techniques will change as technology advances. Many new devices permit the monitoring of vehicles and people, and in all likelihood more will come. A new vehicle may be equipped with devices that permit others to ascertain its location at any time. Cell phones and wireless devices permit carriers to track and record the location of users. The quest for new technology is endless, and it is only a matter of time before a court must consider the next advancement.

¶ 90. With each technological advance, courts must stand firm and guard the very core of the Fourth Amendment—the security of one's privacy from arbitrary intrusion by the government.[25] The Fourth Amendment is not designed to protect the criminal; it is designed to protect all of us.

¶ 91. With ever-expanding technological advances, law enforcement should not necessarily be

---

[24] *See* Mike Tolson, *Chief Justice Roberts: Technology Among Top Issues for Court,* Houston Chronicle, Oct. 17, 2012.
[25] *Wolf v. Colorado,* 338 U.S. 25, 27 (1949).

bound to the use of earlier approved specific technology. Still, the surveillance technology used does affect a court's view of the nature and validity of the intrusion.

¶ 92. The United States Supreme Court first validated the use of mobile tracking technology in *United States v. Knotts* when it analyzed the nature and intrusion of the warrantless insertion of a beeper into a container in order to track the container's movements.[26] The signal from the beeper enabled law enforcement officers to follow a vehicle carrying the container more easily. The beeper could not, however, perform any tracking on its own or record the location of the container. GPS locational tracking technology has more capabilities than the beeper technology. A GPS device's advanced technology does not simply assist visual surveillance as did the beeper. It tracks the details of every movement of the vehicle. The nature of the technology does affect the Fourth Amendment analysis.

¶ 93. Here, law enforcement officers had a warrant for the installation of a GPS device. The warrant does not comply with the Wisconsin statutes governing warrants, but non-statutory warrants have been accepted by this court. I continue to disagree with this position.[27]

---

[26] *United States v. Knotts,* 460 U.S. 276, 281–83 (1983) (no Fourth Amendment violation when beeper surveillance amounted principally to following an automobile on public streets and highways). *Compare United States v. Karo,* 468 U.S. 705, 714 (1984) (warrant required to use a beeper to monitor activities inside a private residence).

[27] I wrote in dissent in *State v. Sveum,* 2010 WI 92, ¶ 90, 328 Wis. 2d 369, 787 N.W.2d 317 (Abrahamson, C.J., dissenting), that the warrant authorizing the GPS device in the *Sveum* case did not comply with the statutes authorizing warrants and was therefore void. The *Sveum* majority held statutory authority

¶ 94. The GPS device installed did not match the device described in the affidavit. The Fourth Amendment requires that a search warrant restrict the scope of a search by "particularly describing the place to be searched, and the persons or things to be seized,"[28] and that the warrant be reasonably executed.[29] The United States Supreme Court has not ruled on whether an officer's failure to comply with restrictions in the warrant demands suppression of evidence under the Fourth Amendment.[30] This court does not carefully examine the terms and execution of the warrant to evaluate the invasion of privacy and reasonableness of the search.

¶ 95. In contrast, the United States Supreme Court has begun the discussion. The United States Supreme Court recently decided a GPS device case, *United States v. Jones,* ___ U.S. ___, 132 S. Ct. 945 (2012), in which a unanimous court held that the warrantless installation of a GPS device within a vehicle constituted an invalid search within the meaning of the Fourth Amendment. But the Court was divided on the rationale. The Justices in separate opinions

was not necessary for the issuance of a warrant. The warrant in the present case, like the warrant in *Sveum,* does not comply with the Wisconsin warrant statute.

[28] *Dalia v. United States,* 441 U.S. 238, 255 (1979).

The particularity requirement prevents three evils: general searches, the issuance of warrants on less than probable cause, and the seizure of objects other than those described in the warrant. *Sveum,* 328 Wis. 2d 369, ¶ 28.

[29] In *Jones,* 132 S. Ct. at 948, the government conceded noncompliance with a warrant authorizing installation of a GPS device in the District of Columbia within ten days. The device was installed on the 11th day and in Maryland, not the District. The Court treated the installation of the GPS device as a warrantless search.

[30] *Jones,* 132 S. Ct. at 964 n.11 (2012) (Alito, J., concurring).

explored the legal issues to give themselves, the bar, law enforcement, and the public insight into the troublesome issues.

¶ 96. Justice Sotomayor in her concurrence in *Jones* raised important considerations in taking the attributes of GPS monitoring into account when considering the application of the Fourth Amendment to these searches. A GPS device does not merely record illegal activity. It records every movement of the car and its occupants—every site visited. The GPS device thus gives the government significant personal information about the car and its occupants, in addition to any information it may provide about criminal activity. Justice Sotomayor explored GPS technology and the Fourth Amendment's protection of a person's reasonable expectation of privacy as follows:

> In cases involving even short-term monitoring, some unique attributes of GPS surveillance . . . will require particular attention. GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations. The Government can store such records and efficiently mine them for information years into the future. And because GPS monitoring is cheap in comparison to conventional surveillance techniques and, by design, proceeds surreptitiously, it evades the ordinary checks that constrain abusive law enforcement practices: "limited police resources and community hostility."
>
> Awareness that the Government may be watching chills associational and expressive freedoms. And the Government's unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse. The net result is that GPS monitoring—by making available at a relatively low cost such a sub-

stantial quantum of intimate information about any person whom the Government, in its unfettered discretion, chooses to track—may "alter the relationship between citizen and government in a way that is inimical to democratic society."

I would take these attributes of GPS monitoring into account when considering the existence of a reasonable societal expectation of privacy in the sum of one's public movements. I would ask whether people reasonably expect that their movements will be recorded and aggregated in a manner that enables the Government to ascertain, more or less at will, their political and religious beliefs, sexual habits, and so on. I do not regard as dispositive the fact that the Government might obtain the fruits of GPS monitoring through lawful conventional surveillance techniques. I would also consider the appropriateness of entrusting to the Executive, in the absence of any oversight from a coordinate branch, a tool so amenable to misuse, especially in light of the Fourth Amendment's goal to curb arbitrary exercises of police power to and prevent "a too permeating police surveillance."

More fundamentally, it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties. This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks. People disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers. Perhaps, as Justice ALITO notes, some people may find the "tradeoff" of privacy for convenience "worthwhile," or come to accept this "diminution of privacy" as "inevitable," and perhaps not. I for one doubt that people

611

would accept without complaint the warrantless disclosure to the Government of a list of every Web site they had visited in the last week, or month, or year. But whatever the societal expectations, they can attain constitutionally protected status only if our Fourth Amendment jurisprudence ceases to treat secrecy as a prerequisite for privacy. I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.[31]

¶ 97. Justice Alito in his concurrence in *Jones* opined that the best solution to privacy concerns regarding long-term monitoring devices may be legislative.[32] He wrote that until the legislature acts on new technological methods of surveillance, the "best that we can do . . . is to apply existing Fourth Amendment doctrine and to ask whether the use of GPS tracking in a particular case involved a degree of intrusion that a reasonable person would not have anticipated."[33] Using this approach, the Justice concluded that "the use of

[31] *Jones,* 132 S. Ct at 955–57 (Sotomayor, J., concurring) (citations and parenthetical comments omitted).

[32] I repeat the essence of what I wrote in my earlier dissent in *Sveum,* 328 Wis. 2d 369, ¶ 126 (Abrahamson, C.J., dissenting): I recognize that the problems presented by technologically assisted physical surveillance are complex and that the interests of privacy and crime detection are substantial. The courts, and especially this court, should not do violence to the legislatively enacted warrant statutes in an ill-advised attempt to bend clear and established law to fit novel and fast-changing technology. The myriad of technical, legal, and policy issues involved in electronic surveillance lend themselves to legislative resolution, not ad hoc judicial authorizations or a bewilderingly complex judicial attempt to shoehorn the possibilities of new surveillance technologies into the parameters of statutes that were never meant to accommodate them.

[33] *Jones,* 132 S. Ct. at 964 (Alito, J., concurring).

longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy."[34] (The warrant in the present case authorized use of the GPS device for 60 days; it was maintained for four days. The issue of the duration for which the GPS may be authorized or used is not broached in the majority opinion in the instant case.)

¶ 98. This court has already advised the legislature that legislative action is needed. None has been taken. Here, the court makes a second request.

¶ 99. I would urge the Judicial Council,[35] the Legislative Council, the Office of the State Public Defender, the Attorney General, and the Criminal Law Section of the State Bar,[36] either separately or jointly, to study the Fourth Amendment issues raised by GPS devices and other technological developments and make proposals to the legislature or to this court (if appropriate for rule making).

¶ 100. I recognize, however, that as long as this court appears to allow any conditions in the warrant authorizing installation of a GPS device and the use of

---

Justice Crooks, Justice Ziegler, and I made a similar request to the Wisconsin legislature in our separate opinions in *Sveum,* 328 Wis. 2d 369, ¶¶ 77, 79, 84, 126. The Wisconsin legislature has not yet acted.

[34] *Jones,* 132 S. Ct. at 964 (Alito, J., concurring).

[35] The Judicial Council has begun consideration of the GPS device issue but has stopped its study to await the decision in the present case.

[36] The Criminal Law Section "provides education, resources and other support for prosecutors, defense attorneys and judges who practice criminal law at the local, state and federal levels. The section monitors and proposes legislation in the area of criminal law . . . ." State Bar of Wisconsin, http://www.wisbar. org/AM/Template.cfm?Section=Criminal_Law_Section (last visited Jan. 17, 2013).

any type of GPS technology without legislative authority, there is no incentive to seek a legislative solution regarding the parameters for warrants authorizing the installation and monitoring of GPS devices.[37]

¶ 101. The majority opinion does a disservice to law enforcement, the bar, the bench, and the public by not carefully exploring issues presented in the instant case that Chief Justice Roberts and Justices Sotomayor and Alito have highlighted.

¶ 102. For the reasons set forth, I cannot join the majority opinion.

---

[37] One final comment about the case: Even if the towing and stowing of the vehicle were illegal, it does not inevitably follow that the evidence ultimately discovered must be suppressed when a valid (according to the majority) search warrant was executed. To determine whether the warrant issued was "genuinely independent" of the earlier "tainted" seizure, *Murray v. United States,* 487 U.S. 533 (1988), is instructive. *See also State v. Carroll,* 2010 WI 8, 322 Wis. 2d 299, 778 N.W.2d 1 (discussing *Murray*). Neither the parties nor the majority opinion discusses this aspect of Fourth Amendment and exclusion law, and I need not and will not comment further on this point.