ANN WALSH BRADLEY, J. (dissenting).
¶78 Without a warrant or a constitutional exception to the warrant requirement, a majority of this court[1] countenances the search of a person's blood by the government. Although set forth in two separate opinions, a majority of the court indicates that this is okay. I call it an unconstitutional violation of the Fourth Amendment.
¶79 According to the lead opinion,[2] once Randall consented to the draw of her blood, she forever gave up her right to object to the government analyzing *796 her blood. In reaching its conclusion, the lead opinion[3] erroneously ascribes no independent *248 constitutional significance to the chemical testing of blood seized by law enforcement.
¶80 The lead opinion arrives at its flawed conclusion by conflating the "seizure" of Randall's blood, which was accomplished lawfully, with the "search" conducted through chemical testing. As a result, it collapses the seizure and search into a single constitutional event. This flawed construct permeates and compromises its analysis.
¶81 Turning a blind eye to everyday realities, the lead opinion compounds its errors by discounting in this post-HIPAA[4] era, society's reasonable expectation of privacy in the contents of a person's blood. Ultimately, it minimizes the significant privacy interest previously identified by the United States Supreme Court.
¶82 Because I conclude that a person does not lose the reasonable expectation of privacy in the contents of one's own blood after it is seized by law *797 enforcement, the results of the blood test conducted in defiance of Randall's withdrawal of consent must be suppressed.
¶83 Accordingly, I respectfully dissent.
I
¶84 Randall was arrested for operating a motor vehicle while under the influence of an intoxicant. Lead op., ¶2. She consented to a draw of her blood, and a medical professional completed the blood draw. Id.
¶85 However, after the blood was drawn but before the blood was tested, Randall's counsel sent a letter to the State Crime Lab indicating that Randall no longer consented to the testing of her blood. Id., ¶3. Specifically, the letter detailed that Randall "hereby revokes any previous consent that she may have provided to the collection and analysis of her blood, asserts her right to privacy in her blood, and demands that no analysis be run without specific authorization by a neutral and detached magistrate upon a showing of probable cause and specifying the goal of analysis." She further indicated that "she does not consent to any person or entity retaining possession of her blood sample, and therefore demands that it be returned to her or destroyed immediately."
¶86 Despite Randall's withdrawal of consent, the Crime Lab tested and analyzed the blood anyway. Lead op., ¶4. After the test revealed a blood alcohol level of .210 grams of ethanol per 100 milliliters of blood, the State sought to use the blood evidence at trial. Id., ¶¶4-5.
¶87 Randall moved to suppress the blood evidence, arguing that she clearly and unequivocally withdrew her consent for the blood to be tested. She *798 contended that absent consent, no other exception to the warrant requirement applied, necessitating suppression of the evidence.
¶88 Agreeing with Randall and suppressing the blood evidence, the circuit court analogized the blood at issue to a cell phone in the context of *249 Riley v. California, 573 U.S. 373, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014). It opined, "[w]e are exactly in the situation of the Supreme Court case Riley ... where the State was in possession of an item that they believed contained evidentiary information that, with probable cause, would show that a crime had been committed or was being committed; and, therefore, were justified in seeking and obtaining a warrant to have the phone searched. That's what we have."
¶89 The circuit court ultimately determined that "as a matter of constitutional law, the defendant ... did withdraw her consent for the search prior to the blood being tested.... She retained the right to withdraw that consent. For the State to be allowed to use that evidence at trial over her lack of consent or to have those test results used without ... a warrant, and without a constitutional exception to a warrant, violates the Fourth Amendment."
¶90 In the circuit court's view, Randall was not, however, entitled to have the blood returned to her or destroyed: "She cannot withdraw her consent to have the blood taken from her. That was done and over with."
¶91 The State appealed and the court of appeals affirmed, but on different grounds than those relied upon by the circuit court. Rather than using the analogy to Riley, the court of appeals determined that although "the taking and testing of the blood, together, comprise a single search to which constitutional protections *799 attach ... the search had not yet been completed when Randall withdrew her consent before the blood was tested and, therefore Randall retained her right to withdraw her consent to continuation of that search ...." State v. Randall, No. 2017AP1518-CR, unpublished slip op., ¶2 (Wis. Ct. App. June 14, 2018) (citing State v. VanLaarhoven, 2001 WI App 275, ¶16, 248 Wis. 2d 881, 637 N.W.2d 411 ; State v. Wantland, 2014 WI 58, ¶¶33-34, 355 Wis. 2d 135, 848 N.W.2d 810 ).
¶92 Now reversing the court of appeals, the lead opinion concludes that "the State performed only one search when it obtained a sample of Ms. Randall's blood and subsequently analyzed it for the presence of alcohol or other prohibited drugs. That single search ended when the State completed the blood draw." Lead op., ¶39. Further, it determines that "a defendant arrested for intoxicated driving has no privacy interest in the amount of alcohol in that sample. Where there is no privacy interest, there can be no constitutionally-significant search." Id.
II
¶93 The lead opinion initially missteps by failing to ascribe independent constitutional significance to the testing of Randall's blood, conflating the lawful "seizure" of Randall's blood with the "search" conducted through chemical testing. As a result, it collapses the seizure and search into a single constitutional event. Such an error runs counter to the United States Supreme Court's decision in Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 616, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).
¶94 In Skinner, the Supreme Court explained that "[o]ur precedents teach that where, as here, the Government seeks to obtain physical evidence from a *800 person, the Fourth Amendment may be relevant at several levels." Id. Beyond the initial seizure of evidence, "[t]he ensuing chemical analysis of the sample to obtain physiological data is a further invasion of [a person's] privacy interests." Id.
¶95 Mere months ago, the Texas court of criminal appeals[5] addressed a similar *250 issue. In State v. Martinez, the court determined that "the Supreme Court considers the analysis of biological samples, such as blood, as a search infringing upon privacy interests subject to the Fourth Amendment." 570 S.W.3d 278, 290 (Tex. Crim. App. 2019). It founded this conclusion on " Skinner's characterization that chemical analysis was a 'further' invasion of privacy interests and that collection and testing were 'intrusions' (plural) that constituted 'searches' (plural)." Id. (citing Skinner, 489 U.S. at 616-617, 109 S.Ct. 1402 ).
¶96 Yet, the lead opinion gives short shrift to the passages from Skinner that clearly demonstrate that the Court considered the "collection" and "testing" as separate intrusions for Fourth Amendment purposes. The testing is a "further invasion of ... privacy interests." Skinner, 489 U.S. at 616, 109 S.Ct. 1402 (emphasis added).
¶97 The lead opinion instead misreads grammatically a single sentence of the opinion and apparently relies on the Skinner Court's use of the singular definite article "a" to assert that "[t]he Court's grammar also signaled it understood itself to be addressing a single search." Lead op., ¶16 n.6. Such a singular focus fails to see the forest for the trees.
¶98 Further elucidating the lead opinion's error is the United States Supreme Court's very premise in *801 Riley: "whether the police may, without a warrant, search digital information on a cell phone seized from an individual who has been arrested." 573 U.S. at 378, 134 S.Ct. 2473 (emphasis added). The distinction between the initial seizure and the analysis of the seized material is a key one, yet the majority treats the two discrete events as one continuous "search." See lead op., ¶39.
¶99 Contrary to the lead opinion's assertion, the testing of a person's blood is an independent "search." Whether a "search" occurs for purposes of the Fourth Amendment turns on whether the government violates a subjective expectation of privacy that society recognizes as reasonable. State v. Brereton, 2013 WI 17, ¶34, 345 Wis. 2d 563, 826 N.W.2d 369 (citations omitted).
¶100 Under the facts we address here, Randall expressed her subjective expectation of privacy in the contents of her blood by way of her letter to the State Crime Lab. The next question in the analysis is whether society recognizes such an expectation as reasonable. It is plain to me that it does.[6]
¶101 One need look no further than "the existence of federal and state privacy laws governing the disclosure and transmission of health information, such as HIPAA" as reflective of a societal view that health information is private. Martinez, 570 S.W.3d at 291. It is an everyday reality for people to call a health care provider seeking a loved one's medical test results and to be denied access based on privacy concerns *802 codified in state and federal law. See Wis. Stat. § 146.82 ; 42 U.S.C. § 1230d-6. This omnipresent practice informs society's reasonable expectation of privacy in blood test results.
¶102 That society recognizes such an expectation as reasonable is further illustrated by the United States Supreme Court's opinions in *251 Riley, 573 U.S. 373, 134 S.Ct. 2473, 189 L.Ed.2d 430, and Birchfield v. North Dakota, --- U.S. ----, 136 S. Ct. 2160, 195 L.Ed.2d 560 (2016). In Riley, the Supreme Court determined that a warrant is required to search digital information on a cell phone seized from an arrested person. It reasoned:
Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans 'the privacies of life[.]' The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought. Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple-get a warrant.
Id. at 403, 134 S.Ct. 2473 (internal citation omitted).[7]
¶103 At the forefront of the Riley Court's decision were the strong privacy interests inherent in the personal information contained on a cell phone. See id. at 393, 134 S.Ct. 2473. It wrote:
*803 The United States asserts that a search of all data stored on a cell phone is 'materially indistinguishable' from searches of these sorts of physical items. That is like saying a ride on horseback is materially indistinguishable from a flight to the moon. Both are ways of getting from point A to point B, but little else justifies lumping them together. Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse. A conclusion that inspecting the contents of an arrestee's pockets works no substantial additional intrusion on privacy beyond the arrest itself may make sense as applied to physical items, but any extension of that reasoning to digital data has to rest on its own bottom.
Id. (internal citation omitted).
¶104 In my view, the privacy concerns regarding the data on a cell phone apply equally to data that can be gathered from a person's blood. Indeed, the Riley court observed concerns regarding medical information on cell phones as a key part of its rationale in requiring a warrant to search a phone's contents. Id. at 395-96, 134 S.Ct. 2473 ("An Internet search and browsing history, for example, can be found on an Internet-enabled phone and could reveal an individual's private interests or concerns-perhaps a search for certain symptoms of disease, coupled with frequent visits to WebMD."). The amount of information that can potentially be gleaned from a person's blood is significant and goes beyond mere blood alcohol content.[8] See Birchfield, 136 S. Ct. at 2178.
*804 ¶105 Downplaying this concern, the lead opinion asserts that "[a]lthough her blood contains a wealth of personal information, the tests undertaken by the State reveal only information directly related to the purpose for her arrest, to wit, the presence *252 and concentration of alcohol or other prohibited drugs." Lead op., ¶35. However, the United States Supreme Court in Birchfield found it of concern that a blood test "places in the hands of law enforcement authorities a sample that can be preserved and from which it is possible to extract information beyond a simple BAC reading. Even if the law enforcement agency is precluded from testing the blood for any purpose other than to measure BAC, the potential remains and may result in anxiety for the person tested." Birchfield, 136 S. Ct. at 2178.
¶106 This consideration is amplified by the fact that a person does not know what information a blood test may reveal, and it could even reveal information not previously known. See Kelly Lowenberg, Applying the Fourth Amendment When DNA Collected for One Purpose is Tested for Another, 79 U. Cin. L. Rev. 1289, 1311 (2011). The majority does not assuage this concern.
¶107 In sum, there exists a reasonable expectation of privacy in the contents of a person's blood regardless of the purpose for which testing is sought. Such an expectation does not disappear after the blood has been seized.
¶108 Under the facts of this case, suppression is appropriate because testing was completed without a warrant and absent any exception to the warrant requirement.[9] After Randall withdrew her consent for *805 the blood to be searched, there existed no independent legal justification on which to base a warrantless test.
¶109 For the foregoing reasons, I respectfully dissent.

This opinion is confined to blood samples that have been drawn for purposes of alcohol or drug testing subsequent to arrest for driving while intoxicated. It does not address privacy interests that might otherwise attach to testing for other purposes.

Wisconsin Stat. § 343.305(4) provides in relevant part:
You have ... been arrested for an offense that involves driving or operating a motor vehicle while under the influence of alcohol or drugs ....
This law enforcement agency now wants to test one or more samples of your breath, blood or urine to determine the concentration of alcohol or drugs in your system.

The Honorable Nicholas J. McNamara of Dane County Circuit Court presided.

When I refer to the Fourth Amendment, I include Article I, Section 11 of the Wisconsin Constitution as its provisions provide a similar framework in which to discuss Randall's contentions.

Lead op., Section A "Two Searches" (¶¶14-19) and Section B "One Continuing Search" (¶¶27-31).

My conclusion is bolstered by Wis. Stat. § 343.305, which specifically authorizes law enforcement to request a blood draw upon arresting a driver for operating under the influence, or upon having "reason to believe" the driver has been operating under the influence. § 343.305(3)(a) & (am). When an officer requests a blood draw, the driver may refuse. See § 343.305(4) & (9). However, refusal of a blood draw carries consequences, including revocation of the driver's operating privilege. § 343.305(9).
Here, consistent with Wis. Stat. § 343.305, the arresting officer requested a blood draw to test for alcohol and drugs and read Randall the requisite information under § 343.305(4). Randall had the opportunity to revoke consent prior to the blood draw, but she chose not to do so.

Lead op., ¶¶20-23.

Lead op., ¶20.

Lead op., ¶26.